REILY et al. v. CRYMES.

(In Banc. May 25, 1936.)

[168 So. 267. No. 31978.]

**Welch & Cooper,** of Laurel, for appellants.

**D. G. Fountain** and **R. R. Dinsmore,** both of Jackson, and **Graham & Graham,** of Meridian, for appellee.

**Per Curiam:**—This is the second appearance of this case in this court, the first appeal being reported in Pan-

American Life Ins. Co. et al. v. Crymes, 169 Miss. 701, 153 So. 803. By the majority opinion in that case it is shown that one J. D. Crymes, Sr., was in June, 1922, appointed guardian of his incompetent son, who had become the victim of some mental disease as a result of service in the United States Navy during the World War, and who was confined to a government hospital, but was entitled to certain sums to be paid from time to time by the Veterans' Administration as disability compensation. The opinion further discloses that on December 4, 1922, the guardian had collected for his ward in cash one thousand two hundred dollars and forty-one cents, and that on that day the guardian was allowed by the court to borrow the said money on the security of real estate owned by the guardian, as an individual; that on November 19, 1923, the guardian had collected a further sum of one thousand thirty-two dollars and forty-one cents, and was allowed by the court to borrow that additional sum on the same security; and that on June 4, 1925, the guardian filed his first annual account showing collections of about two thousand dollars, in addition to the two other sums above mentioned; and that on the same day he presented his third petition to borrow this last-mentioned additional sum on the same security, and this petition was also allowed.

The opinion recites further that in a few days after the third loan transaction, the guardian petitioned the court for a release of a portion of the property included in the deed of trust given to secure said loans, and that on October 19, 1929, a second petition for a release of another portion of the property was presented and allowed, it being represented to the court by the guardian in both these petitions that the remaining property was adequate in value to secure the loans aforesaid. That the said guardian had sold the property released, and that in fact the remaining mortgaged property not released and not sold was insufficient by far as security for the balance due the ward. That some time after the

year 1930 the guardian died, leaving a wholly insolvent estate.

. The bill reviewed in that opinion was filed by the successor guardian to recover of the bondsmen on the several bonds given by the original guardian during the course of his guardianship. The first bond for one thousand dollars was given when the letters of guardianship were first issued. The second bond was given as an additional bond on December 20, 1923, for four thousand dollars, with M. W. Reily, Nate S. Williamson, and T. P. Crymes as sureties. On June 4, 1924, a new bond was given in the sum of five thousand dollars with the Union Indemnity Company as surety, and an order was made by the court purporting to release the second bond from any further liability. The Union Indemnity Company later became insolvent, and was put in the hands of receivers.

The sureties on the first and second bonds above mentioned defended the bill by demurrers, and on the main ground that because the court had allowed the guardian to borrow the money coming into his hands during the periods of their suretyship and on security then adjudged to be adequate, the said sureties could not be held liable for the improvident action of the court in subsequently releasing from the security given by the guardian those portions of the property which embraced the greater part of the value, so that the remaining property was insufficient by far to cover the debt due by the said guardian.

In anticipation of this defense, the successor guardian had averred in her supplemental bill, among other averments: "That the deceased guardian never opened any guardian account at any bank until long after all the guardian bonds herein sued on were executed, but deposited all trust funds received during said time in his private personal bank account, or cashed the trust checks and appropriated all the moneys to his, the deceased guardian's own benefit, and at the time the de-

ceased guardian petitioned the Honorable Court for permission to loan to himself said trust funds on representations to the Court that certain definite sums of money in trust funds were then on hand, such funds were in fact not then in the hands of the deceased guardian, but in fact had already been converted by the guardian to his own use and the guardian's petitions for and the decrees of the court permitting the deceased guardian to use said trust funds and the giving of the three deeds of trust securing said trust funds by the deceased guardian were all done and executed at a time when in fact there were no trust funds in the hands of the guardian to be loaned or borrowed, and the only effect thereof was to secure trust funds already converted by the deceased guardian, all of which facts existed while all three of the guardian's bonds herein sued on were in full force and effect, and all of which facts were by the deceased guardian withheld from the court besought by the deceased guardian to grant the various releases set up herein as defenses, which the court never would have considered granting, had the deceased guardian disclosed the true facts to the court as it was his duty to do and his failure to do so was a breach of trust for which he and his sureties are liable.''

To the allegations quoted in the foregoing paragraph, this court responded on the former appeal, beginning at page 715 of 169 Miss., 153 So. 803, 805, which response became and is the law of the case, binding alike on the parties, on the trial court, and on this court, as follows:

''The third question is whether the orders aforesaid are void for fraud in their procurement, or because of the circumstances under which made. The bills allege and the demurrers admit that when the guardian applied to the court praying these several orders allowing him to borrow the money in his hands, the guardian did not in fact at said times have the funds in his hands, but that he had already converted them to his own use; in other words, that the petitions presented were not in

fact to borrow money then on hand but were to cover up embezzlements already committed. The majority of the court is of the opinion that a guardian has no right to use the trust funds for his own purposes, that is to say, to convert them to his own use, and that any such use before obtaining an order of the court is a breach of his trust; and when intentionally and deliberately done is sufficient evidence of his unfitness for further trust. In Smith v. Smith (D. C.), 210 F. 947, affirmed 224 F. 1, 139 C. C. A. 465, it was held that when a guardian misappropriates the funds of the ward to his own use and then obtains an order from the court authorizing a loan to himself of the same funds, keeping secret the fact of his previous conversion, his conduct constitutes a gross fraud upon the court and renders its order for the loan void, the court remarking that if the disclosure had been made, it would be inconceivable that the court would have made the order for the loan. Of the fatal effect of a failure to make a full, or at least a fair, disclosure to the court in seeking orders in guardianship matters, there is an apt illustration in Union Chevrolet Co. v. Arrington, 162 Miss. 816, 138 So. 593. The majority of the court therefore holds that the orders allowing the loans were void on the ground stated in this paragraph, if the facts as alleged shall be sufficiently sustained on the proof.''

Upon the remand and answer filed, the answer denied the allegations that the guardian had converted the funds to his own use previously to the several petitions to borrow the funds, and denied that the guardian did not in fact have the money on hand at the time of said petitions; and it was with this issue that the evidence principally dealt in the hearing now under review. The chancellor upheld the allegations of the bill upon the evidence, and two of the sureties, Messrs. Reily and Williamson, have appealed, and their principal argument is that the decree is manifestly wrong upon the facts.

There are some important facts bearing upon said

principal issue which we shall here mention, and which facts are substantially undisputed. At the beginning of this guardianship, and up to and including the time when the second petition for an alleged loan was filed and presented on November 19, 1923, Mr. Reily attended to the legal affairs of the guardianship as solicitor for the guardian. Mr. Reily testified that "the old man (referring to the deceased guardian) could not understand why he could not spend his son's money as he thought right; he thought it right for him to spend the money as he saw fit. . . . He always argued with me his right to spend it in any way he saw fit for his child without any order of the court. If you knew him you knew he was a hardheaded old man." After the date last mentioned, Mr. Parker, who was Mr. Reily's law partner, attended to the legal affairs of the guardian and until the time when the order attempting to relieve Messrs. Reily and Williamson was entered.

The testimony is undisputed that the government remittances, most of them on a monthly basis, were upon receipt thereof by the guardian deposited immediately to his own personal account in the First National Bank of Meridian and nowhere else, and that no guardian's account was opened until after the date of the attempt to release the bond of appellants Reily and Williamson. As against these deposits, from the beginning to the end, numerous small checks were drawn each month, nearly all in odd amounts corresponding in every feature with the ordinary account of a person conducting his own private banking business. But the fund which should have been on hand, and which was represented as being on hand at the time of the first alleged loan, to wit, one thousand two hundred dollars and forty-one cents, on December 4, 1922, had not then been entirely spent, the bank ledger showing a credit to the account of the guardian, but as an individual, on that date of eight hundred twelve dollars and eighty-nine cents. Following this and down to the date of the alleged second

loan on November 23, 1923, when the guardian represented to the court that he had cash on hand in an additional sum of one thousand thirty-two dollars and forty-one cents, the balances in bank to the credit of the guardian, but always as an individual, did not average exceeding one hundred dollars per month, and on the date last aforesaid, instead of his having on hand one thousand thirty-two dollars and forty-one cents, his balance was twenty-eight dollars. On June 4, 1925, when he represented to the court that he had on hand a further additional sum of one thousand eight hundred twenty dollars, with the interest on the previous alleged loans, his balance in bank was twenty-one dollars and thirteen cents, and going back from that date to the previous alleged loan on November 19, 1923, his average monthly balances were still less than one hundred dollars and the checks against the account were throughout in the same odd and small amounts which characterize the everyday bank acount of the private citizen, in regard to his ordinary and everyday expenses. And it is further an undisputed fact that only a small and comparatively insignificant part of the funds were sent to or spent for the ward.

It is admitted in the evidence, and not anywhere disputed, that on each occasion, when the guardian petitioned for the loans to himself, he personally represented to the court that the property which he was tendering as security was unincumbered, and that the ward would have a first lien thereon, and yet the records introduced in evidence, and now before the court, show prior incumbrances by the guardian of which he could not possibly have been ignorant; and, as already mentioned, he represented personally to the court when he obtained the releases above mentioned, that the remaining property was adequate as security, whereas the facts show to the contrary and so definitely that the guardian could not have been innocent of this misrepresentation and fraud.

As stated, the appeal now before us is by the sureties, Reily and Williamson. None of the others decreed against have appealed. As already stated, the bond given by Reily and Williamson was given on December 20, 1923, and was attempted to be released on June 4, 1925. The facts in evidence definitely show, and beyond serious dispute, that between said dates the guardian collected in cash for the ward's account the sum of two thousand one hundred seventy dollars and thirty-two cents which with the interest properly calculated upon each collection, under the law, to the date of the hearing, amounted to three thousand five hundred forty-two dollars and eighty-seven cents. Against this the expenditures made for the ward during the same period with interest allowed thereon amounted to only forty-nine dollars and seventy-five cents, which when deducted from the three thousand five hundred forty-two dollars and eighty-seven cents leaves a balance of three thousand four hundred ninety-three dollars and twelve cents, which is the amount decreed against Messrs. Reily and Williamson, and is correct, since the court found, and we think was supported by the record in so finding, that the guardian appropriated each collection to his own personal use as fast as received.

As already mentioned, Mr. Reily and Mr. Parker attended to this estate for the guardian from its inception to the time when it was supposed that the bond of Reily and Williamson was released. This record is barren of any suggestion that any living person would have a better or more precise knowledge of what was done by the guardian, and how it was done, than the two named attorneys, and, as will later appear, neither of them had any definite or precise recollection, particularly upon the main issue now before the court. The defense to the liability on the Reily and Williamson bond is a denial that the guardian did not have the money on hand on June 4, 1925, which his account, then filed, pretended that he had on hand, and the concurrent

defense that having the money on hand the loan of it to the guardian, as authorized by the court on that date, protects the bondsmen. Mr. Reily and Mr. Parker both testified as witnesses. Mr. Reily frankly conceded that he had no personal knowledge whether the money was on hand on the date last mentioned; because, as he admits, the matter was then being attended to by Mr. Parker.

It is upon Mr. Parker's testimony that appellants chiefly rely and make the most of. We will quote his answers to questions upon this principal point whether in fact the guardian had the money on hand at the time mentioned, that is to say, when the first annual account was presented on June 4, 1925, when the third loan was made, and when the Reily and Williamson bond was attempted to be released.

"Q. Mr. Parker do you know anything of your own knowledge with reference to the money when you prepared the first annual account? A. I know the amount of money reported on hand was correct and in his possession at that time.

"Q. Do you know where it was? A. It was my recollection it was in the First National Bank. That I can't be positive about.

"Q. Did you make any investigation personally? A. I know I made an investigation, but what it was I can't say. I would not be able to recall all the incidents of it. I know I took the interest and figured it up and added it to the other money and prepared it to present to matter so the new bondsmen would start even.

"Q. Just how that money which he may have had was evidenced you don't recall? A. No sir.

"Q. You don't know whether it was a time certificate or cash or in a lock box? A. I don't think it was cash. I think that would have made an impression on me that I could not have forgotten.

"Q. He had a lock box? A. Yes.

"Q. You don't know what all was in it? A. No sir. . . .

"Q. Did you know in what amounts this money was being received by the guardian? A. I did not at that time.

"Q. Did you know where the guardian was depositing these checks? A. I did not.

"Q. Did you make any inquiry as to what he was doing with the money as he received it? A. I did not."

In the quoted testimony, Mr. Parker says the money was not exhibited to him in cash, either from a lock box or otherwise; that he has no recollection how it was evidenced, but that his best recollection was that it was in the First National Bank; and, as we have already pointed out, the cash which the guardian had on hand on June 4, 1925, in any form in the First National Bank was twenty-one dollars and thirteen cents. The most that he had had on hand in the bank at any one time for three months previous thereto was ninety-five dollars and sixty-six cents.

Appellants say in their brief: "This record shows facts which would justify the court in finding that the guardian intermingled the guardianship funds with his private funds, by depositing such guardianship funds with his private account, and that the funds were withdrawn from this account for other purposes than for the ward; but this does not make liability on the part of the sureties on the guardian's bond, if such funds were in the possession of the guardian when the report was made." And they argue that although the guardian may have previously spent the funds, Mr. Parker's testimony shows that the funds were in the possession of the guardian when the report was made, yet as we have already shown, Mr. Parker admits that he did not see the money, but thought it was in the First National Bank, and this latter impression of his is demonstrated by the record to be incorrect. We think the chancellor was justified in holding that Mr. Parker's testimony, phrased as we have

quoted it, fell short of making any such showing in any such cogent manner as that the court could prudently deny the relief prayed by the successor guardian because of that testimony. At least we cannot say that the chancellor was manifestly wrong in not being controlled by it, as against the countervailing strong, not to say overwhelming evidence, which was of such a convincing nature, in behalf of appellees.

But appellants argue that even if Mr. Parker's evidence be not sufficient standing alone, it is sufficient when considered along with the following two additional features of the record: First, that the administrator of the deceased guardian did not testify and show what money and effects the deceased guardian had when he died—that he must have had notes or securities among his effects, and that there was no showing as to what was in his safety deposit box; and, second, that the testimony of Mr. Parker must be taken as strengthened and corroborated by the prima facie effect of the interlocutory adjudications of the court in allowing the guardian's three petitions to borrow, and the decree approving the first annual account.

As to the point first mentioned in the foregoing paragraph, the successor guardian had averred in her supplemental bill as follows: That after the sale by the guardian of the released lands, "the deceased guardian was then and there insolvent and ever remained insolvent until his death, leaving his estate insolvent as declared by decree of this court." This allegation is undenied in the answers and, therefore, stands as admitted. The court could not, and would not, have declared the estate insolvent until all the various matters as to the property and effects and securities, if any, belonging to the deceased guardian, including anything that may have been in a lock box, were inquired into and shown to the court. The decree of insolvency, admitted as aforesaid, made the suggested proof in this case wholly unnecessary.

Upon the second point: As between ward and guard-

ian and the sureties on the guardian's bond, all these orders or decrees were obtained ex parte and had no effect beyond that which has already been expressed, to wit, a prima facie effect. But because of the fraud charged in their procurement, the proof necessary is more than a mere preponderance, but must be clear and convincing as in other fraud cases in the civil law. But no such weight of proof is necessary as in criminal cases, wherein proof is required to the exclusion of every reasonable doubt, or in criminal cases of circumstantial evidence, to the exclusion of every other reasonable hypothesis.

In civil cases, as we have so often heretofore said, courts act upon the reasonable probabilities. Conjectures and possibilities are not sufficient upon which to base a judgment or decree; and, on the other hand, neither of them are sufficient to avoid a judgment or decree when the proof points to the probabilities. And when, as in this case, the preponderance of the reasonable probabilities has become of such weight as to make the evidence in behalf of the prevailing party clear and convincing, it is enough to establish fraud and to prevail against ex parte interlocutory orders obtained by the fraud thus established, so far as concerns the parties and privies to those orders. If any such rule of evidence were established that successor guardians, or the wards, were required to prove the charge against the guardian of fraudulent administration beyond a reasonable doubt or to the exclusion of every other reasonable hypothesis, guardian's bonds would become of but little use, and in most cases had as well not be taken at all.

Much has been said in the discussion of this case which, when analyzed, amounts to the contention that although the guardian had spent the funds, converting them to his own use without any previous arrangement with the court so allowing, yet when he brought in security by way of a deed of trust sufficient to cover the amount so converted and spent, and the court had accepted the security as sufficient, and thereupon the

bondsmen were released and a new bond taken, the previous bondsmen should not be held to liability when the court, without their knowledge or consent, as in this case, made improvident orders releasing the security until it became utterly inadequate to cover the amounts converted and spent during the time when the older bonds were in full force and effect. Sympathizing fully because of the hardship which such a case imposes upon the older bondsmen, we must in duty bound declare that the stated contention is unsound and untenable both in principle and upon authority.

Except as authorized by statute, no guardian has the right to convert the money of his ward to his own use and to spend it for his own personal purposes; and when he does so, it is as much an embezzlement in a legal sense as when the treasurer of a corporation or firm, or any other fiduciary of funds does the like. That precisely is what we held on the former appeal in this case, and which has already been quoted herein. See, also, 28 C. J., p. 1155, sec. 267. And although there seems to be an impression among many guardians, especially when the guardianship is of a child of the guardian, that the guardian has the right to spend the ward's money as the guardian may see fit, and even for the personal purposes of the guardian, without any interference by a court, which impression, as already shown, the guardian in this case had and insisted upon, every experienced lawyer must agree that the opening statement of this paragraph is the law not only, but ought to be the law, governing guardians as well as other custodians of funds. If the law were otherwise, it would be practically impossible to procure solvent bondsmen for guardians, and the waste of estates would become the rule rather than the exception.

The bonds of guardians in this state, section 1869, Code 1930, contain the condition that the guardian "shall faithfully discharge all the duties required of him by law." When a guardian converts the money of

the ward to his own personal use, without previously having arranged by the proper proceeding under section 1885, Code 1930, to borrow the funds upon security approved by the court, the guardian had been guilty of a breach of his bond, Pan-American Life Ins. Co. v. Crymes, supra, 169 Miss. 701, at page 716, 153 So. 803, and he and his bondsmen have become liable as in debt for the money thus converted; and having become thus indebted, there is no authority in any court in this state to release that debt except upon payment thereof, not in property nor in securities, but in money. As said in Bell v. Rudolph, 70 Miss. 234, 241, 12 So. 153, 154, "payment alone can discharge the obligation." See, also, 28 C. J., p. 1300. The court may aid the bondsmen of a guardian who has converted and spent his ward's money without authority by accepting security for the accrued debt from the guardian and enforcing the same in behalf of the bondsmen; but the court has no power to release the obligation of the bondsmen upon such security, however ample; and the liability continues until satisfied in the only way it can be satisfied, to wit, by payment. Security of payment by mortgage or deed of trust on property, however adequate at the time, is not a payment, as the experience of the last five or six years in this state and generally throughout the country has so often and so sadly demonstrated.

Affirmed.

**Ethridge, J.**, delivered a dissenting opinion.

This case was formerly before this court from a judgment on demurrer under the style of Pan-American Life Insurance Co. et al. v. Crymes, 169 Miss. 701, 153 So. 803, and the differing views of the judges are set forth therein. It was there held by a majority of the court that if the proof should sustain the allegations as to fraud, the bill would state a cause, and that liability would exist against the surety on the guardian's bond.

The cause was remanded for proof on the issue of fraud, and the chancellor held that fraud was proven in that the guardian, at the time he procured an order for the loans to himself on several occasions, did not have on hand the money borrowed from the ward for himself, as guardian, on the security presented.

I am of the opinion that the proof on the hearing was utterly insufficient to establish fraud. The order of the chancellor permitted J. D. Crymes, individually, to borrow money from himself as guardian of his ward, and such order was entitled to prevail and the good faith of the transaction be held until there was clear and convincing proof that there was fraud in fact perpetrated upon the court by J. D. Crymes, Sr., in securing orders authorizing loans on the security presented therein. In Brown v. Barlow, 51 Miss. 7, in the first syllabus it is stated that, ''The orders of the court upon the annual accounts of guardians import a sanctity and verity as to the matters set out therein, and constitute to that extent immunity to a purchaser.'' In the opinion it is stated that, ''If the guardian in his ordinary annual accounts charges himself with the money as collected and on hand, and the court approves his account, and directs him to loan the money or retain it on interest; this is an adjudication that the fund, heretofore standing out on the securities of the purchase, has become amenable to its jurisdiction as money, and it accordingly disposes of it to make profit for the ward. That insues as clearly from the action of the court, as if it had entered up an order, formally declaring that the lien is satisfied. The partial or annual accounts of the guardian are prima facie correct as against the ward. Heard v. Daniel, 26 Miss. [451] 452, 453. Several cases hold that annual accounts are conclusive against the guardian, subject, however, to correction, for inadvertence and oversight, mistake or miscalculation. McFarlane v. Randle, 41 Miss. 411, 423; Johnson v. Miller, 33 Miss. 553; Coffin v. Bramlitt, Guardian, 42 Miss. [194] 206, 97 Am. Dec.

449. If partial settlements, passed in the probate court, have such dignity, and are so binding upon the parties who make them, it would be a hard rule which would impose upon strangers who ventured their money upon the faith of what they import, less insight and force. A purchaser from the vendee of the guardian, cannot claim the immunity of an innocent buyer, unless the records of the probate court show in some distinct and unmistakable form that the original debt has been paid, and the court has recognized the fact. That has been emphatically done in this case. First, the guardian has acknowledged that the debt has been paid to him, year after year, in his annual accounts. The court has approved these accounts, and upon each settlement has ordered the guardian to keep or loan the balances at interest. In several of these accounts the guardian charges himself with ten per cent. interest on these balances; the larger part of which was made up of the proceeds of the lands. On examination of these records, Mrs. Barlow, or her husband who negotiated for her, might unhesitatingly conclude that the debt to the guardian had been paid and the lien discharged.''

In Coffin v. Bramlitt, 42 Miss. 194, 206, 97 Am. Dec. 449, cited above, it is stated in the syllabus that, ''Guardians, executors, administrators, and other trustees, so long as they keep themselves within the line of their duty, and exercise reasonable care and diligence, cannot be made responsible for any loss or depreciation in the fund intrusted to them.''

On the hearing of the case at bar in the court below, from which the appellants' appeal is prosecuted, the administrator of the deceased guardian did not testify as to what money and effects he had when he died, and the records of the administrator, J. D. Crymes, Sr., who died subsequent to the release of the appellants from their bond, were not introduced or examined to see what property and funds he had among his effects when he died. The guardian, Martha Crymes, first took out letters of

administration on the estate of J. D. Crymes, Sr., deceased, and later J. H. Graham was appointed as administrator, and neither of them was introduced as a witness to show that J. D. Crymes, Sr., deceased, had ever converted any of his ward's property to his own use, or to show what transactions he may have made during his lifetime in disposing of the funds intrusted to him as guardian of his son. He must have had canceled checks showing what money was paid, either to himself or to third persons, and he must have had notes or other security or deeds of trust among his effects. He seemed to have had a safety deposit box in a bank, as shown in his accounts as guardian, and no proof was taken as to this box, or whether it was opened after his death, nor were there introduced any of the administrative proceedings, inventories, and reports. All that was introduced in evidence to sustain the charge of fraud was the ledger sheets of the First National Bank, which was subsequently liquidated, and most of its records destroyed.

J. D. Crymes, Sr., is shown to have had a personal bank account from about 1922 until the release of Reily and Williamson from his bond as guardian and the acceptance of the Union Indemnity Company as surety; and this personal bank account shows checks to him from the United States government for his son and ward deposited in the accounts at various and sundry times. None of the checks drawn against this bank account were produced, nor was any witness produced to show to whom the money was paid. After the acceptance of the Union Indemnity Company as surety, J. D. Crymes, Sr., carried an account as guardian in said bank, as reflected by the ledger sheets, but these did not show the amount of money on deposit in the bank by him as guardian when he secured a loan as claimed in the petition for the said loan; and when the release of Reily and Williamson as sureties on his guardian's bond was ordered, Reily and his partner, Parker, testified as wit-

nesses to the effect that when the first loan was made, Reily assisted therein, but that many years had passed, and his recollection was that Crymes had the money then on hand. Parker had handled the matter until after the release of Reily and Williamson, and his recollection was that Crymes, Sr., had money, but he could not say definitely how much, or exactly where, but that the loan was made in good faith, and Crymes represented then that he had a sufficient amount of money.

I think that the evidence was utterly insufficient to overcome the presumption and legal effect of the court's judgment that J. D. Crymes, Sr., Guardian, had cash on hand at the various times and dates the loans were made. The decree of the court showed that the security tendered was more than sufficient to secure the amount of money which the guardian borrowed.

We held in the former opinion that the court had authority under section 1885, Code of 1930, to authorize the guardian to borrow money from himself, and to pass upon the security which he gave as guardian to secure the loans so made.

There is no question about the security being ample, had the court not, after releasing Reily and Williamson, released a large part of the property embraced in the deed of trust therefrom. The loan would at all times have been well secured, and would now be secured.

The chancery court has constitutional jurisdiction, and the record need not show the facts authorizing the exercise of its jurisdiction in a particular case. Every presumption is indulged as to the validity and legality of the action of the chancery court. Ames v. Williams et al., 72 Miss. 760, 17 So. 762, where it was held that under the Constitution the court had general jurisdiction in guardianship matters, and did not depend upon statutes for its exercise, and that every presumption would be indulged to uphold its action.

In Cohn v. Winslow, 115 Miss. 275, 76 So. 264, it was held that when the chancery court designates the per-

son to whom the money shall be loaned, and the loan is so made, responsibility does not thereafter attach to the guardian. In this case the guardian placed funds in the bank, under approval order of the court, and the bank failed. It was held that the guardian and sureties were not liable.

After the release of Reily and Williamson as sureties, and the acceptance of the Union Indemnity Company as such, the court first released the property described as lots 12 and 13 of the Mineral Springs Survey, for six hundred dollars, and permitted the guardian to take one hundred dollars for expenses incurred in laying out said property into lots; and directed that five hundred dollars be credited upon the debt. Thereafter, in 1929, after releasing appellants from the guardian's bond, the court released a large number of lots, embracing lots from 14 to 22, and a part of 23, of the Mineral Springs Survey, which was a valuable property in a growing section of the city, where lots had been laid out and water connections made, greatly enhancing the value of the property. It was recited in the petition that A. H. George had offered as much as nine thousand dollars for the property remaining and not so released, and that such property was more than ample security for the payment of the debt, and it was recited in the petition that the only reason this was not carried out was that A. H. George, because of failing health, did not perfect this offer by purchasing.

One of the decrees showed that some money was being used for improvements upon the property which would greatly increase its value, and that the city of Meridian was being extended in this direction; and in Reily's testimony it was shown that this property had been taken into the city limits subsequent to his release as surety for the guardian.

In 1925 the first annual account was filed, showing the money collected by the guardian and the loans made by

the court to him, and the accounts were filed annually thereafter.

The appellants, Reily and Williamson, were released as sureties from the guardian's bond on June 4, 1925, and about the 10th day of June, while the Union Indemnity Company was the sole surety, a new loan was made, giving security ample in amount therefor. The local agent of the Union Indemnity Company at Meridian, trustee in the deed of trust, signed a petition for the release, representing that the remaining security was ample. The Union Indemnity Company at that time was perfectly solvent, and had a right to consent to the release from liability. That the chancery court has full power to authorize acceptance of property or security for the money of a ward whose estate is being administered in that court, is shown by sections 1880 and 1881, Code of 1930. The manner in which this power is exercised is not material. Ames v. Williams, 72 Miss. 760, 17 So. 762; Neely v. Craig, 162 Miss. 712, 139 So. 835. The far-reaching power of the chancery court in dealing with estates of infants and non compos mentis persons is illustrated by the cases of Kelly v. Neville, 136 Miss. 429, 101 So. 565, and Crawford v. Solomon, 131 Miss. 792, 95 So. 686.

The decision in the case at bar deprives the gratuitous sureties on the guardian's bond of the right to rely upon the solemn adjudication of the chancery court, made on hearing and inquiry. Such a doctrine is harsh and unjust. Instead of making the chancellor's judgment controlling and binding on the ward and the sureties, it makes the sureties, at their peril, determine the legality of the solemn judgment of the court. The statutes are intended to make the chancellor the final judge of the propriety of the acts of the guardian and of the sureties, and has given him full power to pass on the investment or the loans of the funds belonging to the ward, and has expressly provided that if he names the persons to whom a loan is made, or the security to be

taken therefor, the guardian is not liable. This decision makes it extremely perilous for any person or surety company to make a guardian's bond, and in my opinion will result in mischief rather than benefit.

In Ames v. Dorroh, 76 Miss. 187, 23 So. 768, 71 Am. St. Rep. 522, this court held that the surety on a guardian's bond, from the date of its execution, is the creditor of his principal for all sums he is required to pay because of his suretyship, within the meaning of the statute against fraudulent conveyances. In the case before us, by virtue of this relationship, Reily and Williamson had a right to resort to the security given for the payment of any amount due by J. D. Crymes, Sr., as guardian; and if they should be required to pay any amount themselves, to be subrogated to the right of the ward therefor.

In 12 R. C. L. 1169, sec. 59, it is provided that, "The surety on a guardian's bond is a creditor of his principal from the date of its execution, though no default occurs until long afterward. The liability, whenever happening, relates back to the date of the contract. He can, therefore, maintain a bill in equity to set aside a voluntary conveyance made by the guardian to his wife after the date of the bond, but before occurrence of the default. If the surety has been compelled to make good a defalcation of the guardian, he is subrogated to any right of the ward against one who assisted in the defalcation." See, also, Ætna Indemnity Co. v. State, use of Gillaspy et al., 101 Miss. 703, 57 So. 980, 39 L. R. A. (N. S.) 961.

In Culliford v. Walser, 158 N. Y. 65, 52 N. E. 648, 70 Am. St. Rep. 437, it was held that as between different sets of sureties who undertake to secure the same debt, although in different stages of legal proceedings, the primary liability rests upon the last set, and various authorities are there collated by the editor.

In the case at bar, the chancellor in his decree in the court below held that the Union Indemnity Company

was not liable for the amount the guardian had on hand at the time it became surety.

If there was any invalidity in the proceedings at all, it was in the release of the lots from the deed of trust which Crymes, Sr., as an individual, had given to Crymes, Sr., as guardian, as it appears no consideration was given to the ward by the parties securing the release.

In Water Valley Mfg. Co. v. Seaman, 53 Miss. 655, it was held that a guardian cannot release without payment any valid security belonging to the trust estate in his hands.

It is doubtful if the court below in the instant case had any right to proceed with the suit against the Union Indemnity Company, or to adjudicate anything with reference to its liability, or with reference to the relative rights between the parties, the Union Indemnity Company and Reily and Williamson, because of the loan. Before the issue was tried as fraud, the Union Indemnity Company had been placed in a receivership, and the chancery court of Hinds county had full charge of administering its affairs in Mississippi. Application was made by the complainant to the chancery court of Hinds county for permission to proceed with the suit in the chancery court of Lauderdale county, which application the Hinds county chancery court refused to grant, stating that the chancery court of Hinds county could give appropriate relief. However, the chancery court of Lauderdale county took the position that it could proceed to judgment, rendered a decree fixing liability as to the Union Indemnity Company, from which no appeal has been prosecuted.

We held in Rea v. O'Bannon, 171 Miss. 824, 158 So. 916, that a receiver appointed by judicial authority, in the absence of a statute to the contrary, cannot be sued without leave of the court which appointed him. We reiterated this holding in Sullivan v. Hughes, 172 Miss. 744, 161 So. 316, and Sullivan v. Calvin, 173 Miss. 80,

161 So. 677. I mention this because of the possible error that affirming that decree might have, without proper reservation of the rights of Reily and Williamson to file a suit for contribution against the Union Indemnity Company, and to proceed against the property released from the deed of trust, to which release they were not parties.

I am personally of the opinion that the chancery court was in error in declaring liability against the Union Indemnity Company because it was in receivership, and the court having jurisdiction of the receivership had refused permission to proceed against it.

**Cook, J.,** and **Smith, C. J.,** also dissent.