[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 650 
 I. INTRODUCTION
On May 5, 1988, the court-appointed conservator for Beatrice Irene Bryan filed a complaint in the Chancery Court of Harrison County, First Judicial District, against the previous conservator, James A. Bryan, and his wife, Elizabeth M. Bryan, in two counts: (1) count one, directed against James and Elizabeth Bryan, alleged they were holding assets and property of the ward, Beatrice Irene Bryan, and sought damages plus interest stemming from intentional misappropriation of funds and defrauding of the estate; and, (2) the second count sought a judgment against the surety bonding company which had written James Bryan's conservatorship bond, Western Surety Company, for $20,000.00, the amount of the bond. James and Elizabeth Bryan appeal from an adverse judgment of $177,159.44 entered on March 26, 1990. This Court holds conservators, as fiduciaries of the ward's estate, can be held personally liable for violating the fiduciary duty and misappropriating estate funds; and, further directs that law firms representing the estate have the option of obtaining court assistance when unable to obtain the cooperation of the conservator in complying with statutory requirements governing the conservatorship. For the reasons below, this Court affirms the judgment against James and Elizabeth Bryan, and also affirms the judgment against the surety bonding company.
 II. FACTS AND PROCEDURAL HISTORY
In March 1979, Beatrice Irene Bryan (the ward) was declared incompetent by court order and James A. Bryan, her nephew, was appointed conservator of her estate. The ward was a retired psychologist, and James Bryan's elderly maiden aunt. The initial estate inventory was filed with the court on January 1, 1980. Approximately two and a half years later, on June 7, 1983, an inventory and accounting was filed and approved by the court with a reservation concerning $28,000.00 listed as a "joint business investment" between the ward and James Bryan, the conservator. Some four years later, June 2, 1987, the estate's attorneys filed a motion for a hearing requesting conservator James Bryan report on the status of the conservatorship. Approximately six months later the conservator was removed by court order because of delays in filing accountings and inventories. The court appointed a conservator, Frank Holzer, the appellee herein, who, three months after appointment, filed the complaint which resulted in the action at hand. James and Elizabeth Bryan answered on June 6, 1988, asserting a general denial, and Western Surety Company answered and filed a cross-complaint on June 7, 1988.
Later an agreed final judgment was entered with Western Surety Company under the indemnification agreement, whereby if a judgment were taken against its principal *Page 651 
(James Bryan), he would be liable to reimburse them.
After the conservatorship was established, James asked Elizabeth to keep the conservatorship books. At his behest she prepared a ledger in which she kept the checking account and expense records, and prepared all the checks for his signature. Elizabeth Bryan testified at length concerning the loans made to family members and friends from the conservatorship monies, and the gifts made to family members. She herself had received a loan from the ward's funds. Additionally, during one of the wards "lucid moments," she had told Elizabeth to buy herself a $600 ring.
Improvements had been made on the property owned jointly by the ward and James and Elizabeth Bryan on which the Bryan's mobile home sat and where they lived. This was also where the ward's mobile home, in which she lived prior to entering the nursing home, had been located. Although Elizabeth Bryan testified some of these expenditures had been for getting the ward's mobile home cleaned up for sale, this money all came from the conservatorship account. After the ward had been placed in the nursing home, they sold her trailer house for $8,000.00 at 12% interest. Elizabeth Bryan contended all these funds had been paid into the conservatorship account.
According to Elizabeth, after the conservatorship was established, she had written checks, which James signed, to pay obligations the ward had incurred prior to being declared incompetent. Some of these had been to Danbury Mint for $1,153.15 for a collection of small pewter cars which were a gift to James. Others had been written to Franklin Mint for $787.50 for a collection the ward had started. This collection was turned over to conservator Holzer. Still other payments had been made to Sears for about $2,820.47 to pay for some of the ward's clothes and a riding lawn mower which was used to mow the land around the mobile homes.
Twenty-eight thousand dollars in conservatorship monies were used to construct a building which housed a machine shop located in the Bryans' back yard. After the machine shop was built, James Bryan, in order to promote the business, had purchased motorcycles and sponsored two brothers to race them. A 1980 Dodge van had been purchased from conservatorship funds for use in hauling the motorcycles, and in delivery operations associated with the machine shop; and, it was also regularly used by both Bryans for other purposes.
Testimony revealed James Bryan had purchased a bass boat, a couple of race horses, and a motor home. It was disputed whether these items were purchased with the ward's money.
During the time James was the conservator, the income into the ward's account had been her monthly social security check and her monthly retirement check from the VA. Elizabeth said these were mostly deposited into the conservatorship account, although some were cashed to buy personal items for the ward.
Richard G. Matheny, executive vice-president of Merchants Bank and Trust in Gulfport, revealed three certificates of deposit (CDs) had been taken out after the conservatorship had been established, in the amounts of $20,000, $21,000, and $22,500. These were all held in joint ownership with the payees listed as "B. Irene Bryan or James A. Bryan." About three and a half months after the $22,500 CD was issued, the records indicated it had been used as collateral on a $21,000 note which had been taken out by James Bryan. The stated purpose of the note was for the purchase of a motor home. Two months and twenty-one days later, the loan was repaid with the proceeds from cashing in the CD.
The trust officer of Hancock Bank testified concerning two CDs held by that bank. Both were issued in the names of "James A. or B. Irene Bryan." One was in the amount of $20,000 and the other was for $10,000. Both had been taken out after the conservatorship was established. The CD for $20,000 was issued August 16, 1979, and was cashed by James A. Bryan for $21,000 on February 17, 1981. The $10,000 CD had been cashed by James A. Bryan on March 16, 1981, after the conservatorship *Page 652 
was established. Both were cashed before the 1983 court-approved accounting was filed.
The court-appointed conservator, Holzer, testified concerning the status of the conservatorship account and the books concerning the account, as he had received them from the Bryans. During his testimony, much of which contradicted portions of the testimony given by Elizabeth Bryan, the court sua sponte halted the proceedings and announced it was appointing an independent auditor to look at the accounts and help sort out the exact status. The court "extended" the proceedings in order to allow time for the examination. James and Elizabeth Bryan took exception to this, moved Holzer's evidence be entirely excluded and a motion to dismiss be entered in their favor since the plaintiff, Holzer, had failed to demonstrate the charges of fraud set forth in his complaint. This motion was overruled.
The proceedings began again on January 3, 1990, a day in vacation after the audit had been conducted.
John Ellis Montgomery, the court appointed expert, a public accountant and retired IRS criminal investigator in the intelligence division, provided a detailed report of his findings to the court. Based on his examination, it was his opinion many discrepancies and questionable transactions existed in the conservatorship account. All the CDs issued by the Hancock and Merchants Banks had been cashed and disposed of by April 1, 1981, over two years before the court-approved 1983 accounting had been filed, yet the CDs were listed as assets of the estate on the accounting. Two of the CDs, one for $15,000 and one for $21,000, had been cashed. There was no indication of how the proceeds were used, but they had not been deposited to the conservatorship account. The third CD, $10,000 on Hancock Bank, had been cashed March 16, 1981, and the proceeds used to make a $10,000 loan to a family member. The fourth CD in the amount of $22,500 was cashed, and the proceeds used to pay off James Bryan's commercial loan which he had taken out to purchase a motor home.
Although the ledger kept by Elizabeth Bryan indicated the interest payments, totalling $4,500 on one of the loans, had been made, these funds had not been deposited into the conservatorship account. Additionally, interest which accrued on the CDs totalled $9,182.86, but only $500 of this had been deposited to the conservatorship account.
The ledger indicated monthly payments of $158.67 had been collected from the sale of the ward's mobile home, for a total of $4,974.58. However, none of these monies had been deposited to the conservatorship account. The ledger reflected that four payments on yet another loan made to a family friend, had been received in the amount of $34.48 each. None of these monies had been returned to the conservatorship account. Likewise, the three payments received from the loan to one of the Bryan's daughters, totalling $560.97, had not been deposited back into the ward's account.
Furthermore, a total of $16,439.80 in the ward's social security benefits had not been deposited; and, one of the ward's annuity checks for $1,228.68 had not been deposited. Nor had over $11,000 in tax refund checks been deposited into the conservatorship account.
Based on his analysis of the conservatorship checking account, Montgomery concluded a total of $177,159.44 in funds had not been used for the benefit of the ward. This included $117,429.67 in funds not deposited into the account,[1] and numerous *Page 653 
expenditures made which did not benefit the ward. These expenditures included payments to:
 Danbury Mint $ 1,705.75 Franklin Mint 787.50 Gifts to family members 1,830.00 Loans 8,656.05 Miscellaneous Expenditures 4,290.10 Repairs 7,165.37 Secretarial Expenses 5,125.00[2]
Shop Payments 18,800.00[3]
Van Purchase 11,370.00 =========== Total $59,729.77
The Bryans called James Michael McGehee, a CPA and attorney, who testified that of the reports submitted to the court, Holzer's report had not been made using generally accepted standards of accounting or auditing. In his opinion, he was unable to say to a reasonable degree of accounting certainty that Montgomery's report was correct and accurate.
 II. DISCUSSION OF THE ISSUES 1.
The Trial Judge erred in refusing to recuse himself from sitting on the case.
The Bryans, through their counsel, made a Motion for Recusal asking the chancellor to recuse himself from the case when the hearing was reconvened on January 3, 1990. This motion was based upon alleged: (1) ex parte contacts between the chancellor and the Holleman firm which originally represented the conservatorship; (2) ex parte contacts between the chancellor and the attorney representing court-appointed conservator Holzer; and, (3) the chancellor's sua sponte appointment of an independent accountant.
The court Order Discharging and Replacing Conservator was filed December 15, 1987, and was signed by W.L. Stewart, the same chancellor who heard the case at hand. It recites in part:
 THERE CAME to be heard on September 15, 1987, the Motion for Hearing Requesting of Conservator A Report and Status of the Conservatorship of Beatrice Irene Bryan, filed by Boyce Holleman, . . ., and after a hearing the evidence presented and considering same, the Court finds. . . .
 III.
 Due to delays in filing acceptable accountings and inventories with the Court, that it would be in the best interest of the Ward that JAMES A. BRYAN be removed as Conservator. . . .
The legal standards pertaining to judicial conduct come primarily from three sources. The Mississippi Constitution mandates:
 No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties. . . .
Miss. Const. art. 6 § 165 (1890). The statutes of this state also regulate judicial conduct and provide an additional instance which requires a judge to disqualify him or herself from presiding over a case, when the judge may have been "of counsel." Miss. Code Ann. § 9-1-11 (1972) provides:
 The judge of a court shall not preside on the trial of any cause where the parties, or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, or wherein he may have been of counsel, except by the consent of the judge and of the parties.
In addition to the constitutional and statutory provisions regulating judicial conduct, the Code of Judicial Conduct, Canon 3C(1), requires disqualification of a judge under the following conditions: *Page 654 
 (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
 (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding:
Whereas here, the conduct of a judge or chancellor is being examined under the dictates of a canon of the Code of Judicial Conduct, "the Canon enjoys the status of law such that we enforce it rigorously, notwithstanding the lack of a litigant's specific demand." Collins v. Dixie Transport, Inc., 543 So.2d 160, 164 (Miss. 1989); Jenkins v. Forrest County General Hospital,542 So.2d 1180, 1181 (Miss. 1989); Jenkins v. State,570 So.2d 1191, 1192 (Miss. 1990). The standard by which this Court determines if a judge should have disqualified him or herself, is an objective standard under Canon 3. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality."Rutland v. Pridgen, 493 So.2d 952, 954 (Miss. 1986); Jenkins,
570 So.2d at 1192; Collins, 543 So.2d at 166. The presumption is "that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a `reasonable doubt' (about the validity of the presumption) [.]" Turner v. State, 573 So.2d 657, 678 (Miss. 1990). When a judge is not disqualified under the constitutional or statutory provisions, "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." Ruffin v. State,481 So.2d 312 at 317 (Miss. 1985) (quoting McLendon v. State,187 Miss. 247, 191 So. 821, 823 (1939)); Buchanan v. Buchanan,587 So.2d 892 (Miss. 1991); Turner, 573 So.2d at 677.
In the case sub judice Canon 3 provides the only applicable grounds for possible recusal. Under the appropriate standard, the judge is presumed qualified and unbiased. This presumption may only be overcome by evidence showing beyond a reasonable doubt that the judge was biased or not qualified. If a reasonable person, knowing all the circumstances, would doubt the judge's impartiality, the judge is required to recuse him or herself from the case; but, the decision not to recuse is reviewed by this Court under a manifest abuse of discretion standard.
Under the evidence adduced at the hearing, the only ex parte
contacts between the chancellor and the Holleman firm were connected with the motion and hearing to remove Bryan as conservator. The ground for the motion was Bryan's slow responses in providing conservatorship records. Leslie Holleman testified he had not communicated any suspicions about problems with the conservatorship funds. The court's order removing Bryan and appointing Holzer stated the basis for the action was the excessive delays in Bryan turning the books over to the Holleman firm, and in providing accountings.
The attorney representing Holzer testified there had not been any ex parte contact with the chancellor prior to filing the suit. He did have extensive contact with the Holleman firm. After the suit was filed, the only ex parte contact he had with the chancellor involved the fee the court-appointed conservator, Holzer, had to pay the court-appointed auditor/accountant. There had been some tangential mention that, since the case would probably be appealed, the chancellor might ask for assistance in preparing the findings of fact, if any funds were found missing.
This limited evidence and these limited contacts do not overcome the presumption of impartiality beyond a reasonable doubt. Neither does the court's appointment of an independent expert to review the conservatorship meet this burden and show the court was biased. The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards. Cf. Nationwide MutualIns. Co. v. Evans, 553 So.2d 1117, 1119 (Miss. 1989). In the case at hand, the chancellor did not abuse his discretion in refusing to recuse himself from the case. *Page 655 
 2.
 The Trial Court lost jurisdiction over the case after the Plaintiff had announced ready for trial, put on most of his case, and the Court halted proceedings in order to appoint an expert to bolster the Plaintiff's presentation, all done sua sponte by the Court, over objection of the Defendant, and without an order of continuance entered upon the docket of the Court.
 3.
 The Trial Court abused its discretion in appointing an expert to bolster the Plaintiff's case.
During the testimony of Holzer, the plaintiff/appellant's case-in-chief, the court on its own:
 THE COURT: stop[ped] the proceedings at this point and direct[ed] that that audit be conducted because it's obvious to me that we have inadequate data with which to proceed. You're [Mr. Nicholson, attorney for the Bryans] making that point and I concur with it. To be fair to both parties I think that's what we have to have.
 . . . .
 And that's what I'm going to do, require an accounting.
 . . . .
 I'm not halting [the proceedings]. I am extending it because I am going to get — I have that right and obligation. If you will read Griffith on Chancery Practice, it says that a chancellor has the right to require additional evidence at any state. And that's what I'm going to do right now. I find that Mr. Holzer is a very honorable reliable witness; he is not biased or interested in any way; and he has done the best that he can. Up to this point I'm totally satisfied with the report that he's made.
 . . . .
 But it is short of supporting data. That data is within the hands of your [Mr. Nicholson's] clients and it should have been presented to him prior to now. But I can see reasons why it might not have been presented. And I'm not making any judgment or any conclusions, but I want to put someone on the case who will have the capacity to go and find where expenditures went and what, if anything is in the assets of the conservatorship and what, if anything, has been improperly handled. . . . I'm going to recess the hearing at this time. . . .
 . . . .
 (THE TRIAL WAS IN RECESS UNTIL A LATER DATE.)
No formal order of continuance, or order to retain jurisdiction until another court term, was ever filed. After the court-appointed accountant completed his report, the court held a hearing in vacation. The Bryans claim that because the court entered no order of continuance or order to retain jurisdiction, the court lost jurisdiction and had no authority to hear the matter.
Miss. Code Ann. § 9-5-91 (Supp. 1990) provides authority for a chancellor to, in his discretion,
 in vacation, set causes for hearing, . . . try cases, deliver opinions, make and sign decrees, and exercise the same jurisdiction and perform the same duties in vacation as are exercised and performed in term time, except as otherwise provided or precluded by law. He may also deliver opinions and make and sign decrees in vacation in causes taken under advisement by him at term time. . . .
It has long been settled that Chancery Courts in Mississippi which exercise "jurisdiction over guardianships of minors and incompetents and their business have general and constitutional jurisdiction, and all facts necessary to sustain the jurisdiction or decrees of such courts are presumed to exist until the contrary appears in the record." Majors v. Purnell's Pride,Inc., 360 F. Supp. 328, 329 (N.D.Miss. 1973) (citing Miss. Const. art. VI, § 159 (1890); Coglan v. Coglan, 196 Miss. 492,18 So.2d 149 (1944)). *Page 656 
Under the facts of this case, the Chancery Court entered a bench order recessing the hearing until the independent, court appointed audit could be performed. Under these circumstances, the ruling from the bench was sufficient for the court to retain jurisdiction. Additionally, section 9-5-91 provides authority for the hearing to be concluded in vacation time.
Mississippi Rule of Evidence 614 allows the court to, "on its own motion . . . call witnesses, and all parties are entitled to cross-examine witnesses thus called." Rule 706 of the evidence rules provides for court appointed experts:
 (a) Appointment. The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witness agreed upon by the parties, and may appoint expert witnesses of its own selection.
(Emphasis added). The comment to the rule explains, "[s]ubsection (a) provides specifically for the appointment of an expert either on the motion of a party or on the judge's own motion."[4]
Furthermore, chancery courts are under a duty,
 [t]o see that the case was fairly tried, and that all proper testimony was introduced to enable him to render a decision giving exact justice between the contending parties. The very purpose of a court of equity is to extend fairness in determining conflicting claims, and to give full and complete relief in every case presented. The chancellor is in no manner going beyond the duties imposed on him when he so conducts a case that all testimony which will throw light upon the matters in controversy is introduced; and in his discretion he may continue the case or remand it for further proof. . . . He should control all the proceedings. . . . It is his highest duty to see that litigants have fair trials of their causes. To this end it is not improper for him to aid in bringing out competent and relevant testimony.
In the case sub judice the court appointed an independent auditor/public accountant to examine the ledger and other sources of documentation to assist in determining the status of the conservatorship account. The court-appointed conservator, Holzer, had only had access to the ledger and checking account records. The Bryans had not turned over all the property or all of the records to him. In the aid of justice, the court sought additional information to assist it in understanding the actual status of the account, and of the transactions which had occurred while James Bryan was conservator and Elizabeth Bryan kept the books. The chancery court committed no error by this appointment.
 4.
The Trial Court erred in overruling the Defendant's motion to exclude the evidence as to Elizabeth Bryan and dismiss her from the lawsuit.
The Bryans assert the chancery court erred by overruling Elizabeth Bryan's motion to exclude the evidence and dismiss her at the conclusion of the plaintiff's, Holzer's, case-in-chief, and again at the conclusion of all the evidence; and, erred by holding her "individually and severally" liable along with her husband, and the original conservator, James Bryan. The argument is based upon the assertion that Elizabeth Bryan was only a "scrivener" for her husband and was not responsible for any of the transactions in the conservatorship account. *Page 657 
She merely wrote the checks for him to sign.
The evidence shows, however, that she was the direct recipient of loans and gifts coming from the monies in the conservatorship account, as were her children. She also received fees for services rendered in keeping the conservatorship books and writing the checks for the conservator to sign. The van purchased from conservatorship funds was used by both her and her husband, and was still being so used at the time of the hearing. It can also be inferred that Elizabeth enjoyed part of the benefits from the mobile home, bass boat, and other items purchased with conservatorship funds by her husband, although she had not been the direct recipient of these items.
A conservator stands in the position of a trustee, has a fiduciary relationship with the ward and is charged with a duty of loyalty toward the ward. The duty of loyalty as set forth in the Restatement (Second) of Trusts § 170 (1959) provides:
 (1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.
 (2) The trustee in dealing with the beneficiary on the trustee's own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know.
As one court explained:
 A trustee cannot loan the trust fund to himself. Is he in a much better position when he loans it to his wife? Is he in that event in the neutral and prudent position which the court requires of him? Is he free to enforce the rights and remedies accruing on the bond of his own wife? It would certainly seem not; at least, he is not in a position to pursue them with that promptness, efficiency, and vigor which is demanded of trustees. In the exercise of those rights in this instance, for example, the trustee is likely to be in a conflicting position and to be tossed about between a desire to do his duty and a natural desire to be lenient and considerate of the debtor.
In re Randolph, 134 N.Y.S. 1117, 1119 (Surrogates Ct. 1912).
Our statutes also speak to the lending of and use of conservatorship funds.
Miss. Code Ann. § 91-7-253 provides:
 § 91-7-253 Fiduciary not to use funds; investment by fiduciary bank in time certificates of deposit.
 No executor, administrator, guardian, receiver or other fiduciary appointed by or acting pursuant to the authority of any chancery court may borrow or use for his own benefit, directly or indirectly, any of the funds or property of the estate committed or entrusted to him by such court, nor purchase or acquire, directly or indirectly, any interest therein adverse to any creditor or beneficiary of such estate. Nor may he loan the same, or any part thereof, to any parent, brother, sister, son, daughter of, or one in loco parentis to the ward or himself, nor to any attorney or agent representing him or such estate, nor to the wife or any child of such attorney or agent. Nor may any court or chancellor authorize or ratify any such prohibited use, acquisition or loan.
This duty of loyalty itself has been extended to the spouse of the fiduciary, so that the husband and wife are treated as one.London v. Goodman, 6 Misc.2d 277, 162 N.Y.S.2d 972, 977 (1957) ("In applying the rule against divided loyalty, husband and wife are treated as one."); Rest.2d Trusts § 170.
This Court in Brandau v. Greer, 95 Miss. 100, 48 So. 519 (1909), held the guardian and his wife "must be treated as the same person." The guardian had permitted property to be sold under foreclosure. The guardian's wife "bought" the property at the sale without consideration. Where it was unlawful for the guardian to acquire the property, "it could never be held that one holding so close a relation to him as that of wife, and with such identity of interest as usually exists between parties sustaining this relation to each other," could lawfully obtain the property. Brandau, 95 Miss. at 102, 48 So. at 520. *Page 658 
In the case at hand, James Bryan was the actual conservator, but his wife acted at his request to keep the books and make out the checks. She received payment for keeping the books and received the benefit of direct loans and gifts from the conservatorship monies. She also received the indirect benefit of use of the van and other items purchased with the monies. She participated in the disbursal of the monies by writing the checks. Although she did not sign them, she clearly knew where the monies were going. Taking this all into consideration, the chancery court did not err in admitting the evidence against her or in overruling the motion of dismissal.[5]
 5.
The Trial Court erred in overruling the motion to dismiss because fraud, the gravamen of the Plaintiff's complaint, was not demonstrated by clear and convincing evidence. 6. The amount of the judgment was not supported by the evidence.
The complaint alleged the Bryans had intentionally appropriated funds belonging to the conservatorship, thereby defrauding the estate of said amounts.
The Bryans essentially contend the entire suit was based upon the theory of fraud, and allege the evidence failed to prove fraud by clear and convincing evidence. This argument fails to take note of the allegations in the complaint that the funds had been appropriated to the use of the Bryans, or put another way, that the Bryans had misappropriated the funds from the conservatorship in breach of the fiduciary duty.
After the hearings the chancery court found that the Bryans had, "acted in collusion in converting to their own use a sum exceeding $100,000 belonging to the ward." The court concluded they had,
 misappropriated $177,159.44 from the ward's account, even though a small portion of these funds might arguably have been used indirectly for the ward's benefit. The overwhelming remainder of the misappropriated expended funds was not used for the benefit of the ward and, in fact, appear to have been embezzled.
 The evidence is overwhelming that both Bryans knew what they were doing. They intentionally misled their attorneys and this court. They were properly advised as to the duties of a conservator, but instead of following this advice they attempted to hide themselves and their deeds from this court.
 . . . They have breached a sacred and honored fiduciary duty.
On appeal this Court will not reverse a Chancery Court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings. Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Gilchrist Machinery Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986).
 Put another way, this Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based on substantial evidence, the court be manifestly wrong. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., . . . [525 So.2d 746, 753-54 (Miss. 1987)]; Brown v. Williams, et al., 504 So.2d 1188, 1192 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Will of Polk, 497 So.2d 815, 818 (Miss. 1986).
Mullins, 515 So.2d at 1189. This Court examines the entire record and accepts that evidence supporting or reasonably tending to support the findings of fact made below, along "with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact. . . ." Mullins, 515 So.2d at 1189 (quoting Cotton *Page 659 v. McConnell, 435 So.2d 683, 685 (Miss. 1983)). A finding of fact is "clearly erroneous" when:
 although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.
UHS-Qualicare, 525 So.2d at 754. The trial judge sitting as the trier of fact, has the sole authority to determine the credibility of the witnesses. Mullins, 515 So.2d at 1189; Hallv. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963).
As explained in Mullins, when issues before this Court import a clear and convincing burden of proof:
 In determining whether there is in the record sufficient credible evidence that the trial court's findings should be affirmed, we bear in mind the quantum of proof the party burdened at trial was required to produce in order to prevail. . . . Where the appealing party has such a burden at trial [the burden to prove by clear and convincing evidence], he necessarily has a higher hill to climb on appeal, as we look at all of the evidence and decide whether a rational trier of fact may have found undue influence, etc., by clear and convincing evidence. Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2512-13, 91 L.Ed.2d 202 (1986); United States v. Taylor, 464 F.2d 240, 242 (2d Cir. 1972). Put otherwise, the minimum evidentiary offering from the unburdened appellee necessary for affirmance is less than it would be if the preponderance of the evidence rule applied. And the converse is so where at trial the party appellee here bore a clear and convincing evidence burden.
Mullins, 515 So.2d at 1189.
The elements of fraud are well established and must be proved by clear and convincing evidence. Cotton v. McConnell,435 So.2d 683, 685-89 (Miss. 1983); Martin v. Winfield,455 So.2d 762, 764 (Miss. 1984). They include:
 (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.
Martin, 455 So.2d at 764 (and numerous cases cited therein.) In the case at hand, however, the essence of the suit is not actually just fraud, but alleges the conservator and his wife converted the monies and property of the estate to their own use in violation of their fiduciary responsibility.
This Court in Reily v. Crymes, 176 Miss. 133, 168 So. 267, 273 (1936) held:
 Except as authorized by statute, no guardian has the right to convert the money of his ward to his own use and to spend it for his own personal purposes; and when he does so, it is as much an embezzlement in a legal sense as when the treasurer of a corporation or firm, or any other fiduciary of funds does the like. . . . And although there seems to be an impression among many guardians, especially when the guardianship is of a child of the guardian, that the guardian has the right to spend the ward's money as the guardian may see fit, and even for the personal purposes of the guardian, without any interference by a court, every experienced lawyer must agree that the opening statement of this paragraph is the law. . . .
 . . . .
 When a guardian converts the money of the ward to his own personal use, without previously having arranged by the proper proceeding . . . . to borrow the funds upon security approved by the court, the guardian had been guilty of a breach of his bond, . . . . and he and his bondsmen have become liable as in debt for the money thus converted. . . .
Only payment of the monies can discharge the obligation. Reily,
168 So. at 273 (citing Bell v. Rudolph, 70 Miss. 234, 241, 12 So. 153, 154 (1892).
The prohibition against a conservator or fiduciary using or borrowing or lending the ward's funds is contained in Miss.Code *Page 660 
Ann. § 91-7-253, set forth above. The statutes encumber the conservator, and bestow upon him or her all the duties and powers of a guardian. Miss. Code Ann. § 93-13-259 (1972).
In the case sub judice taking all the evidence, and inferences which can be drawn therefrom, in the light most favorable to Holzer, the non-movant, the evidence supports denial of the directed verdict. Reviewing the evidence produced at trial and the findings of facts made by the trial court, an overwhelming amount of proof showed that the conservator and his wife violated the fiduciary duty to the ward and converted the ward's funds to their own use.
In light of this analysis and the testimony adduced at the hearing, the amount of the judgment rendered by the chancery court was well supported and is affirmed. The judgment of the lower court is hereby affirmed as to all aspects concerning James and Elizabeth Bryan.
 III. THE PROCEEDINGS AGAINST WESTERN SURETY COMPANY
James Bryan entered into a Bond and Oath of Conservator with Western Surety Company in the amount of $20,000 in March of 1979, upon being appointed conservator. After the suit was filed, James Bryan and Western Surety Company entered into an agreed final judgment on September 18, 1989. James Bryan agreed to reimburse Western Surety Company the full amount of any judgment rendered against it upon the bond it issued in favor of him, as well as, a judgment for $500 in attorneys' fees and all court costs assessed by way of Western Surety's cross-claim. On March 26, 1990, the chancery court entered a judgment against Western Surety Company in the amount of $20,000 on the bond. This judgment shall stand.
THIS COURT AFFIRMS THE JUDGMENT AGAINST JAMES A. BRYAN AND ELIZABETH M. BRYAN IN THE AMOUNT OF $177,159.44, ENTERED MARCH 26, 1990. THIS COURT AFFIRMS THE JUDGMENT AGAINST WESTERN SURETY COMPANY IN THE AMOUNT OF $20,000 IN FAVOR OF THE ESTATE, AS PER THE AGREED JUDGMENT BETWEEN JAMES BRYAN AND WESTERN SURETY COMPANY ENTERED INTO ON SEPTEMBER 18, 1989. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANTS, AS WELL AS, A FIFTEEN (15) PERCENT STATUTORY PENALTY AND STATUTORY INTEREST.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P. JJ., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
[1]
Certificates of deposit cashed and not deposited $ 68,500.00 Third National Bank, Nashville, TN, Bank account funds not deposited 1,371.75 Refunds of federal income tax not deposited 11,045.11 Social Security checks not deposited 16,439.00 U.S. Civil Service checks not deposited 1,228.68 Interest on CDs not deposited 8,682.86 Collections from receivables not deposited 5,661.47 Michael Andrews interest payments not deposited 4,500.00 ============ TOTAL $117,429.67
[2] This is comprised of: $800 on April 12, 1980 to Douglas Henreques, $2,000 in April 1980, $800 in June 1980, $800 in July 1980, and $725 in Dec. 1980 all paid to Elizabeth Bryan as secretarial expenses.
[3] The Shop Payments consisted of checks made out to James Bryan with notations about the machine shop.
[4] Under federal rules 706(a), identical to the Mississippi rules, McCormick's explains:
Not only may the judge examine witnesses called by the parties, but in his discretion he may also, for the purpose of bringing out needed facts, call witnesses whom the parties might not have chosen to call. . . . Another use of the power, implemented by statute in some jurisdictions, is to mediate the battle of partisan expert witnesses employed by the parties, through the judge's resumption of his ancient power to call an expert of his own choosing, or one agreed upon by the parties, to give impartial testimony to aid him or the jury in resolving a scientific issue. But the judge's power of calling witnesses in aid of justice is general and is not necessarily limited to meeting these particular needs. McCormick on Evidence § 8 (3d ed. 1984).
[5] As James and Elizabeth Bryan have since been indicted for embezzlement, this Court does not consider or reach the question whether the proof adduced at the hearing would be adequate to meet the burden of proof required in criminal cases. Nothing in this opinion should be read as having any bearing upon the criminal prosecution.