543 So.2d 160 (1989)
Curtis Lee COLLINS
v.
DIXIE TRANSPORT, INC. and Michael Weldon White.
No. 58420.
Supreme Court of Mississippi.
April 5, 1989.
Rehearing Denied May 24, 1989.
*161 Edward Blackmon, Jr., Canton, for appellant.
Dorrance Aultman, Patricia L. Trantham, Aultman, Tyner, McNeese & Ruffin, Hattiesburg, for appellee.
Before HAWKINS, P.J., and ROBERTSON and PITTMAN, JJ.
ROBERTSON, Justice, for the Court:

I.
This appeal arises from an order enforcing against the plaintiff an oral settlement agreement allegedly reached regarding an automobile accident personal injury claim. The outcome determinative issue is one of fact, whether plaintiff verbally authorized his attorney to accept a settlement offer. Crucial to the just determination of that issue is the credibility of the witnesses plaintiff presented at the hearing on defendant's motion to enforce settlement, a group that includes the plaintiff himself.
Here matters run aground as the trial judge assumed the role of a fact witness  on the critical credibility issue. When this situation arose, the trial judge had no alternative but to recuse himself from further participation in the case. Because he failed to do so, the order enforcing the settlement must be vacated and the case remanded for a new hearing.

II.
Curtis Lee Collins was born on June 12, 1925. He lives in Scooba, Mississippi, and has no more than a first grade education. On September 1, 1982, Collins was involved in an automobile accident near Scooba with a vehicle driven by Michael Weldon White, an employee of Dixie Transport, Inc. Collins employed John W. Capers, Esq., of Meridian, Mississippi, and Dixon Pyles, Esq., of Jackson, Mississippi, to prosecute his personal injury claim against Dixie Transport.
On April 9, 1984, Collins, acting through his above-named attorneys, commenced this civil action by filing his complaint in the Circuit Court of Forrest County, Mississippi. Alleging common law negligence and statutory violations, Collins demanded compensatory damages of $435,800.00 and punitive damages of $871,600.00. In their answer, Dixie and White denied the essential allegations of the complaint and pleaded affirmatively Collins' negligence.
On the morning of trial, Capers received from the attorneys for Dixie Transport and White a settlement offer of $125,000.00. Capers recommended to Collins that the offer be accepted. Capers, Collins and Collins' two sons, Chris and Timothy, conferred about the matter. Here the facts scatter in as many places as participants there are to tell them. Important today is the hotly disputed testimony that the trial judge was also in the conference room. Collins says the judge was present, the judge insists he was not, Chris Collins says he was, but Timothy Collins says the judge excused himself at the meeting's outset. *162 Capers later described this meeting as a ten to fifteen minute conversation from which "I was authorized to accept by my client, Mr. Collins, the $125,000.00 settlement." No one else in the room now sees it that way.
Capers testified he left the room, approached defense counsel, Dorrance Aultman, Esq., in the hallway and said "The case is settled; we accept the $125,000.00." Aultman replied "Okay, good... but it's gonna take me about four weeks to get this money." Capers proceeded to discharge his witnesses. Aultman told the judge and the judge dismissed the jury. Capers says at this point he walked back into the hallway to tell Collins it would take four weeks for the money. The younger son said "Well, we don't take it then" to which Collins himself nodded in agreement. Capers testified he did not know what to do at this point.
Collins and his two sons remember everything from the conference room on differently. Collins is the least articulate of the witnesses. While he was on direct examination, the following colloquy occurred:
Q. Do you recall meeting them in this room during that day after he made the initial statement to you that an offer of $125,000.00 had been made to settle your case?
A. Well, he was talking in this room  Mr. Pyles and Capers  and conversation come up, one of my boys said, "Both of y'all are fired." Mr. Pyles said, "I don't know you." He said, "Well, I know you."
BY THE COURT: Who told `em that? Who are you saying told that to `em?
A. Me and my boys, three boys  two boys sitting right over there.
BY THE COURT: Which one told them that?
A. Chris. And you said, "I am going to get out of here." I think it was you, somebody sitting over there said, "I'm gonna get out of here, I don't want to be in that conversation. I will see y'all when y'all get settled." And you went on out.
Q. Now after the Judge left 
BY THE COURT: Just a minute. We have arrived at another one of those points and [sic] time when I feel constrained to have to dictate something in this record. Again without putting the Court in a posture of testifying, I do not recall any such communication like that being said 
A. Mr. Pyles told you  said, you wait in here, you said, "No, I'm gettin' out of here, I'm goin' on out of here."
BY THE COURT: No, sir.
A. And that left me and my sons and him in here. You said, "Y'all can tell me what happened whenever you come out."
BY THE COURT: Well, we're just having to make a record here of everything and so the record will be replete of what everybody's memory was, I will tell you unequivocally on this record I have no recollection of that being said in my presence whatsoever.
BY HON. DIXON PYLES: Judge, I would like for the record, as a member of the bar to state as far as memory is concerned. That didn't happen with reference to me.
BY HON. EDWARD BLACKMON, JR.: Judge, for the record I don't know how  we're getting into some very, I guess, ticklish areas 
BY THE COURT: Very.
BY HON. EDWARD BLACKMON, JR.: Considering what the trier of the facts and the witness maybe [sic] saying. This is a very material part of my case into the record and I would like to continue for record purposes.
BY THE COURT: Sure, and I'm just gonna  and I hesitate to interrupt because I know it breaks continuity but I am not going to have something said on this record  inferences made on this record, particularly where it involves any involvement of the Court without at least, having an opportunity to dictate in this record what the Court's recollection of it was. I think we discussed this and for clarity in this record, it should be noted that we discussed all these things *163 prior to beginning these proceedings this morning.
DIRECT EXAMINATION THEN RESUMED.
On cross-examination by the attorney for Dixie Transport, the following question was put to Collins:
Q. Who was present in this room when that conversation about settlement of the case for $125,000.00 took place?
A. My sons and that man sitting right there.
BY THE COURT: Let it be indicated in this record that he is pointing to me and once again let it be replete in this record, I was not, nor have I ever been present when any settlement negotiations of this case was being discussed whatsoever, nor would it be appropriate for me to do so.
Q. Mr. Collins, I know the Judge was outside.
BY HON. EDWARD BLACKMON, JR.: I would object to Mr. Aultman testifying.
BY THE COURT: Mr. Blackmon, once again he has indicated something that I was involved in and I stated my position in the record and Mr. Aultman is just stating in the record what he recalls. I just want it clear in the record that I was not a party to any plea bargain negotiations  settlement negotiations, excuse me.
Further in cross-examination, counsel for Dixie Transport asked Collins whether he or any member of his family had contacted the insurance company  the liability carrier for Dixie Transport  following the breakup of the putative settlement. In that setting, the following exchange took place:
Q. After we had the meeting in the courthouse, I assume it was settled because I was told that. Have you contacted or any member of your family 
A. I couldn't tell you.
Q. You just don't know? Who would know?
A. I wouldn't know. Only God.
BY THE COURT: Now, just a minute. Because previously you said you had here this morning. Which is true? When Mr. Aultman first asked you, you indicated that you had. You understand that you are under oath, don't you?
A. Yes.
BY THE COURT: So you told two different versions, which is it?
A. What do you mean?
BY THE COURT: Did you or someone at your instruction call directly to the insurance company?
A. I couldn't tell you who, I don't know.
BY THE COURT: You don't know if that were done?
A. I don't know that.
BY THE COURT: When he asked you if New York had been called and you answered that it had been I think we need to have it replete in this record about the lack of response from this witness. Each time this Court has asked him a question he has taken somewhere around thirty seconds to a minute to answer.
A. I can't understand what you are saying.
BY THE COURT: What I'm doing is very relevant to this hearing. My recollection is one time Mr. Aultman asked did either you or a member of your family at your instruction call to the insurance company and he indicated that he had. Was your answer some three or four questions later you gave another answer. Which one is it?
A. Well, I don't even know what he's talking about.
MR. AULTMAN CONTINUES:
Q. Mr. Collins, how would a member of your family know to call my client if you didn't know anything about the case being settled for $125,000.00? (No response)
BY HON. DORRANCE AULTMAN: Judge, again we would show for the record the long lapse.
BY HON. EDWARD BLACKMON, JR.: I would  I don't think anything has been shown about the long lapses.
BY THE COURT: Yes, counselor, it seems mighty strange to me that this *164 witness can answer readily questions apparently to his side and I think very pertinent questions by this Court going to the credibility of his testimony, it takes like a minute to two minutes longer and that's why I think it very definitely needs to be shown in this record.
BY HON. EDWARD BLACKMON, JR.: May I take exception with you on that, Your Honor?
BY THE COURT: In light of the severity of the matter before this Court  I don't know if he realizes the severity of it or not. There have been some serious allegations made and I think if we are going to have a record, it needs to be replete of everything going on here.
We have a situation here of a man who can't even remember people's names but yet makes some very serious allegations against them.
Q. What was your answer?
A. What did you ask me?
Q. I asked you why you had called my client if you did not know the case had been settled for $125,000.00?
A. I ain't called your client.
Chris Collins, twenty-three-year-old son of Curtis Lee Collins, was then called as a witness. During the course of his direct examination, Chris Collins described the purported settlement conference and said that he and his father rejected the $125,000.00 settlement offer and "we had dismissed the attorneys," whereupon the following colloquy took place:
Q. Who was present when that statement was made?
A. Judge McKenzie, Mr. Aultman, Mr. Dixon.
Q. How did that come up? How did that conversation come up?
A. After they kept on trying to influence us to take the $125,000.00.
BY THE COURT: O.K. Hold up just a second. At the risk of disputing this witness; again not putting the Court in a posture of being a witness, but I will once again unequivocally in this record that I have no recollection of being present at any point in time when any lawyer was discharged. And when you said "they" kept trying to influence us, you are not suggesting, I'm sure, that I told you you ought to take the money?
A. Can I answer that? At one point in time you said it was a good offer and  we should take it.
BY THE COURT: I said that?
A. Yes, sir.
BY THE COURT: When was that?
A. On the day we was down here for trial.
BY THE COURT: Young man, are you aware you are under oath?
A. Yea.
BY DORRANCE AULTMAN: May I say unequivocally for the record I never heard a lawyer fired.
BY THE COURT: I didn't either, nor have I made any but, you know, I just want that clear in the record.
On cross-examination, Chris Collins was discussing the subject of discharging Capers and Pyles from further representation whereupon the following colloquy occurred:
Q. Now what did you say and to whom?
A. I said that we would like to dismiss Mr. Capers and Mr. Dixon.
Q. And Judge McKenzie and I were 
BY THE COURT: Who did you tell that to?
A. Judge McKenzie and Mr. Dixon.
BY THE COURT: You came in and you made that announcement and you claim I was still in the room?
A. Right. I remember talking to you in the hall `cause myself, I didn't know how to go about it, me and my brother talked to you in the hall downstairs how we should go about dismissing Mr. Capers and Mr. Pyles.
BY THE COURT: Talked to me in the hall?
A. Shore did.
At the conclusion of the testimony Capers and Pyles made extensive statements for the record of their recollection of the events. At that point the trial judge reentered the fray.
... I want to reiterate in this record what my recollection of this entire scenario *165 was. And in light of that fact I want to be placed under oath in order to do that and also to avail any of the attorneys present an opportunity to "cross examine" anything I have to say.
That being the case I'll ask the clerk at this time if she will administer the oath.
BY HON. EDWARD BLACKMON, JR.: Your Honor, before we get into that, I'd like to interpose, of course, an objection. I had not anticipated the Court being a witness to this extent.
BY THE COURT: I had not either, Mr. Blackmon, but I have been placed in that unprecarious situation and I will give anyone an opportunity to ask me any questions under oath that they desire to. I can't conceivably see why you would object to that. But what is your objection to it?
BY HON. EDWARD BLACKMON, JR.: Your Honor, I am afraid that I would be placed in the position then to ask that the proceedings be halted and make a motion at this late date that the Court recuse himself. I'd hate to do that. If I might I would make a statement to the Court. I think that the Court's statements regarding each instance, I think the Court availed itself the opportunity to response at each instance when the Court was placed in that position and I would be willing to let the record stand on that and the Court's response is a matter of record rather than to force the Court to be in a position to take a witness and then me have to cross examine 
BY THE COURT: I have no problem with that whatsoever.
BY HON. EDWARD BLACKMON, JR.: Because, frankly, Your Honor, really I think the case turns on other issues other than the issue 
Notwithstanding counsel's acquiescence that the various comments made by the trial judge during the hearing would serve as his version of the facts at issue, the trial judge proceeded:
BY THE COURT: I'm sure it does but at the same time there have been some very serious allegations in this record, one concerning a lawyer's reputation, two lawyers' reputation could well be on the line in this thing.
* * * * * *
There is testimony before me that I was told down in the hallway that they were dismissing a lawyer and that did not happen. I do recall chatting with some of these individuals. If my life depended on it, I couldn't tell you who, about if they had had a nice lunch, it was pretty day, casual conversation to that extent but nothing to the extent of any of `em indicating to me they were wanting to get  to terminate the services of any attorney. And I have got to have some way to put that in this record.
I will say again I have never gotten involved in any settlement negotiations and I feel it inappropriate for a judge to do so and yet there are innuendos [sic] in this record that I, as the sitting trial judge became involved in that. I did not and would not. There is some indication that I said it was a good settlement. Now again since I perceive myself to be a personable individual each time I excuse a jury when a case has been settled I tell the jury so that they will not think they have wasted their time, that I appreciate their willingness to serve, and that a settlement has been effectuated in this case and that while some people don't like settlements, that this Court does encourage them because at least that way all parties are satisfied. And I'm confident that I probably did that in this case and may have even added that this was an adequate settlement. And that maybe where this is coming from. Someone may have been in the courtroom and heard me say that to the jury as I was discharging them but that is something that I just say perfunctorily to the jury. It may not be an appropriate thing to say. I feel that I have learned my lesson in this case. I will tell you I will not make that statement again in the future but that is not to be construed by anyone that I took any part in this settlement negotiation whatsoever. Nor was I ever present at any point any *166 time where anyone was discharged, contrary to what is in this record. So you know, I don't know, all I want to be able to say to you is I offer myself for cross examination if anyone here has any reason to disbelief [sic] what I've said in this record, and that's my only purpose.
BY HON. EDWARD BLACKMON, JR.: Your Honor, I would like to let stand your statement there without having been placed in that position.
BY HON. DORRANCE AULTMAN: That's fine with me.
BY HON. JOHN CAPERS: Certainly, Judge.
BY THE COURT: All right, I just wanted that clear in the record.
The Court then proceeded to find that a settlement had been effected and ordered it enforced.

III.
No man may serve as judge of his own cause. Dr. Bonham's Case, 8 Co.Rep. 114a, 118a, 77 Eng.Rep. 646, 652 (C.P. 1610); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955). We doubt a more powerful principle may be found in our law. We have labeled it "the ancient first principle of justice." Bell v. City of Bay St. Louis, 467 So.2d 657, 662 (Miss. 1985). The principle's power extends beyond the case of the judge-litigant to that of the judge-witness, to the case where the judge judges his own credibility as a player in the events whose truth is sought.
Elementary notions of due process afford a corollary principle: that a judge who is otherwise qualified to preside at trial or other proceeding must be sufficiently neutral and free of disposition to be able to render a fair decision. No person should be required to stand trial before a judge with a "bent of mind." Berger v. United States, 255 U.S. 22, 33, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921); Wolfram, Modern Legal Ethics § 17.5.5 Independence and Neutrality, p. 989 (1986).
These principles have been reinforced by our Code of Judicial Conduct. Canon 3C(1)(a) requires that
A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned including, but not limited to, instances where: (a) he has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

[Emphasis supplied] In the context of our consideration of other subsections of this Canon, we have held repeatedly that it imports an objective standard. Pearson v. Parsons, 541 So.2d 447, 454 (Miss. 1989); Jenkins v. Forrest General Hospital, 538 So.2d 1162, 1163 (Miss. 1988); Cantrell v. State, 507 So.2d 325, 328 (Miss. 1987); Rutland v. Pridgen, 493 So.2d 952, 954 (Miss. 1986); see also Craig v. Barber, 524 So.2d 974, 978 (Miss. 1988). Moreover, the Canon enjoys the status of law such that we enforce it rigorously, notwithstanding the lack of a litigant's specific demand.
Our concerns have been well expressed by U.S. Circuit Judge Alvin B. Rubin. "Judicial ethics reinforced by statute exact more than virtuous behavior; they command impeccable appearance. Purity of heart is not enough. Judge's robes must be as spotless as their actual conduct." Hall v. Small Business Administration, 695 F.2d 175, 176 (5th Cir.1983). Federal law codifies Canon 3C(1)(a) in the form of 28 U.S.C. § 455 (1976) whereby a judge is "required to disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The case law requires that a judge disqualify himself "if a reasonable person, knowing all circumstances, would harbor doubts about his impartiality." Hall, 695 F.2d at 179.
We have embraced this view in the cases noted above. To the point, in Haralson v. Haralson, 483 So.2d 378 (Miss. 1986), this Court concluded:
Because of allegations that the appellee consulted the chancellor in her choice of attorneys in this case, the chancellor should recuse himself from any further proceedings between these parties. We say this without finding fault and only *167 so that even the appearance of impropriety can be avoided.

Haralson, 483 So.2d at 380. [Emphasis supplied]
In today's case, Curtis Lee Collins testified that the trial judge was in the room during the critical settlement conference. Chris Collins, the plaintiff's son, testified he had a conversation with the trial judge in the court's hallway on how to fire an attorney, a material fact in dispute at the hearing over which the trial judge then presided. Chris testified as well that the judge told him $125,000.00 was a good offer and that he should take it.
In this setting, the trial judge felt compelled to testify throughout the hearing. He repeatedly prefaced his remarks by saying that he was not testifying, and then testified. He went so far as to request the court clerk to swear him in so he could be questioned, but the attorneys balked at that.
On the record before us, the trial judge was both a witness to and adjudicator of fact issues with respect to which he was obliged to have played but one role.[1] As those matters went to what was central  the credibility of Curtis Lee Collins and his sons, we may but reverse the order enforcing settlement. We remand the case to the Circuit Court for a new hearing on the question of whether an enforceable settlement agreement has been reached, whereupon the trial judge shall recuse himself from further participation in this case in the role of judge.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] Lest there be misunderstanding, we do not predicate our decision upon the trial judge's examination of the witnesses. That practice has been authorized by our law, Rule 614(b), Miss. R.Ev.; Layne v. State, 542 So.2d 237, 243 (1989) though not without limits. West v. State, 519 So.2d 418, 422-24 (Miss. 1988). Our focus is upon the fact that the trial judge possessed knowledge of the (non)occurrence of events critical to the credibility of Collins' witnesses and ultimately to divining the truth of those events.