## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01951-SCT

*IN THE MATTER OF THE CONSERVATORSHIP OF MARY CAROLINE LAMBERT BARDWELL, AN INCAPACITATED PERSON: MICHAEL RANDALL BARDWELL*

*v.*

*MARY CAROLINE LAMBERT BARDWELL*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/02/2001 |
| TRIAL JUDGE: | HON. W. HOLLIS McGEHEE, II |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WAYNE DOWDY |
| | DONALD EDWIN WALSH |
| ATTORNEY FOR APPELLEE: | T. MACK BRABHAM |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 07/17/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE McRAE, P.J., DIAZ AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Aggrieved by the chancellor's actions in failing to recuse himself, disallowing conservator's fees, and directing partial repayment of conservator's fees, the stepson of the ward has appealed to this Court for relief. Finding no reversible error, we affirm the judgment of the Amite County Chancery Court.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.    On May 5, 2000, Michael Randall Bardwell (Randy), the stepson of Mary Caroline Lambert Bardwell (Mrs. Bardwell) petitioned the Amite County Chancery Court to be appointed as conservator of the person and estate of Mrs. Bardwell, then eighty-three (83) years of age and a stroke victim.   By order dated May 11, 2000, the chancellor appointed Randy to serve as the conservator.  The order also required Randy to perform an inventory of real and personal property owned by Mrs. Bardwell and file this inventory with the court within sixty (60) days.  Randy also was required to post a $500 bond.  This conservatorship was established in cause number 2000-92 on the docket of the Chancery Court of Amite County.  On July 13, 2000, Randy filed in the conservatorship cause a petition to enter into a timber management contract with Timber and Wildlife Management, Inc. in order to preserve the assets of Mrs. Bardwell's estate, which included the timber located on certain real property belonging to Mrs. Bardwell.

¶3.    The following day, Randy also filed a Petition for Appointment of a Successor Trustee in a separate cause (cause number 2000-139) in the Amite County Chancery Court, requesting the court to appoint him as the successor trustee for the Mary Lambert Bardwell Living Trust.[1]  Apparently, that petition was granted because Randy, as successor Trustee, subsequently joined in the Petition to Enter Into Timber Management Contract which had previously been filed in the conservatorship cause.  On August 29, 2000, Randy petitioned the court to make monetary gifts of $10,000 to himself, his three children, and Leslie Lambert (nephew of Mrs. Bardwell).  In this petition, Randy swore under oath that the value of Mrs.

---

[1]The Mary Lambert Bardwell Living Trust was established in 1991.  Mrs. Bardwell, the ward of the underlying conservatorship, was named as both the Trustor and Trustee.  The trust agreement provided that if Mrs. Bardwell should become unable to serve as Trustee, I've Jewell Lambert, Randy, and Carolyn Powell, respectively, would serve as Successor Trustees.  In the petition to appoint a successor trustee, Randy alleged that Mrs. Bardwell could no longer serve as Trustee by virtue of the conservatorship, that I've Jewell Lambert was deceased, and that Randy should therefore be appointed as the Successor Trustee.

Bardwell's estate, consisting of cash on hand, timber, real property and personal assets, was $1,851,426; however, that petition was denied.[2]

¶4. The Forest Management Plan was filed with the chancery court on September 1, 2000. On the same day, the chancellor entered a decree authorizing the Plan and likewise authorizing the conservator "to pay such expenses and fees that have accrued to the conservatorship and to continue to make such payments as are deemed proper and to account therefore annually." At the end of this sentence, the chancellor inserted a comma in place of the period and then inserted in his own handwriting the words "including conservator's fee to one (sic) of $27,000."

¶5. Thereafter, on October 4, 2000, a Petition to Set Aside Conservator, Appoint New Conservator, Provide an Accounting, and Issuance of a TRO or a Restraining Order was filed by Lester Lambert, Jr. (Lester) as next friend of Mrs. Bardwell. In this petition, Lester alleged that Randy was not acting in the best interest of Mrs. Bardwell in that Randy had violated the applicable statutes on numerous occasions regarding the handling of Mrs. Bardwell's estate. Lester alleged, inter alia, that Randy had (1) failed to provide medical documentation that the establishment of the conservatorship was necessary; (2) failed to post bond as required by statute and the chancellor's order; (3) failed to post a sufficient bond since Randy subsequently filed a petition alleging the value of Mrs. Bardwell's estate to be in excess of $1.8 million; (4) failed to timely file an inventory of the real and personal property of the estate as required by statute and the chancellor's order; (5) made expenditures from estate funds without court authority; (6) entered into a timber contract knowing that at a time when Mrs. Bardwell was capable of understanding business affairs, she had expressly stated to Randy she did not want her timber cut; (7) filed a petition requesting the

_____

[2]Although there is no order in the record indicating that the petition was denied, in his opinion of November 2, 2001, the chancellor acknowledged that the petition was denied, but that counsel simply never submitted an order to the court.

chancellor to authorize Randy to "give away" $50,000 cash to himself, his three children, and a nephew of Mrs. Bardwell; (8) sought excessive conservator's fees in the amount of $27,000; and (9) locked Mrs. Bardwell out of her home. Lester further prayed through the petition that a temporary restraining order (TRO) be issued thereby prohibiting further timber cutting on Mrs. Bardwell's property; that a new conservator be appointed; that Randy be directed to render an accurate accounting for all monies expended and received on Mrs. Bardwell's behalf; and, that Randy be required to pay for the cost of the proceedings, including attorney's fees. Fifteen days after the filing of this petition, the chancellor entered an agreed TRO directing Randy to forthwith "cease and desist" from the cutting of timber on Mrs. Bardwell's property.

¶6. Randy shortly thereafter filed a response generally denying the material allegations of Lester's petition, and on November 14, 2000, Randy filed an inventory reflecting estate assets which included (1) a life estate interest in a home located on 120 acres in Amite County; (2) personal property located in the home; and (3) checking and money market accounts and certificates of deposit in the total amount of $360,459.69. On December 21, 2000, the chancellor entered an agreed order directing Randy, inter alia, to "go forward with the bonding process;" to not expend any conservatorship monies other than that necessary to appropriately attend to Mrs. Bardwell's personal and medical needs; to give Mrs. Bardwell a key to her home; and, to not "remove, damage or destroy anything" on the property. In due course, Randy posted a corporate surety bond in the amount of $350,000 on January 19, 2001. On February 5, 2001, the chancellor entered an order appointing attorney Joseph Stinson (Stinson) as Guardian Ad Litem of Mrs. Bardwell. This same order directed Stinson to conduct an investigation and report back to the court on whether Mrs. Bardwell was in current need of a conservator; whether Mrs. Bardwell was mentally capable of designating a conservator; and, whether Randy should remain as conservator and if not,

4

who should be appointed as conservator of Mrs. Bardwell's person and estate. Additionally, by this same order order, the chancellor appointed Michael Faust (Faust), a certified public accountant, to investigate all financial matters of the conservatorship estate and report back to the court.

¶7.	On March 21, 2001, Faust filed a report with the court thereby setting out the findings of his investigation and further making certain recommendations to the court.  This report found, inter alia, that for the period of May 22, 2000 – to February 9, 2001, expenditures exceeded revenue by $41,565.59. Most notably, the report likewise revealed that during this same period covering less than nine months, Randy had received payments of $47,880.92.

¶8.	On March 26, 2001, Stinson filed his First Report of Guardian Ad Litem which contained specific findings and recommendations.[3]  Suffice it to state here that the findings justified Stinson's recommendations to the court that (1) Randy should be removed as conservator and be required to file an inventory and a final accounting as well as justify the conservator's fee of $27,000; (2) the conservatorship process should be begun anew with the appointment of a new conservator; (3) a timber consultant should be employed on an hourly basis and not on commission; (4) that any sale of timber from Mrs. Bardwell's property should be treated as a sale of real estate as far as seeking court approval for such sale; (5) that the newly appointed  conservator should consider appointing an independent estate planning attorney for Mrs. Bardwell's estate; (6) that the current holder of the timber contract should make an accounting as to timber thus far cut and monies received from the conservatorship estate; and, (7) that a fiduciary should be appointed to protect Mrs. Bardwell's Louisiana property.

---

[3]This detailed 13-page report reflects the Guardian Ad Litem's recognition of his duties and responsibilities to both Mrs. Bardwell and the court.  We commend his diligent performance of these duties and responsibilities and further commend this report as a model  for future court-appointed guardians.

¶9. On April 2, 2001, an attorney on behalf of Mrs. Bardwell and Lester, filed a Motion for Removal of Conservator requesting that Randy be removed as conservator of Mrs. Bardwell's person and estate. Although not filed with the clerk until April 3, 2001, the chancellor had signed and marked filed on March 30, 2001, an order in response to the reports filed by the CPA and Guardian Ad Litem. This order directed Randy to return monies representing unauthorized expenditures from estate assets; to retrieve from the timber consultant and deposit into the conservatorship account any monies held by the consultant and due the estate; and, to re-evaluate and document the $27,000 claim for conservator's fees. The same day a show cause order was entered by the chancellor thereby directing Randy to show cause, if any he could, as to why he should not be removed as conservator for Mrs. Bardwell. On April 5, 2001, the chancellor by order set a hearing date to determine if Randy should be removed as conservator of Mrs. Bardwell's person and estate. Also on April 5, 2001, an amended petition to remove Randy as conservator was filed alleging, among other things, that Randy had been negligent and breached his fiduciary duty and that he misrepresented his fees. The amended petition further charged Randy's conduct throughout his tenure as conservator as being not only in violation of numerous statutes, but also as exhibiting "reckless and callous disregard of his fiduciary obligations to his ward, thereby rendering the ward entitled to punitive damages." In due course, Randy filed a one-page answer to the motion for removal and in this answer, Randy basically asserted that in performing his duties as conservator he had complied with all the applicable statutes and acted appropriately and in the best interest of Mrs. Bardwell. On the same day, Randy filed an answer to the amended petition denying the material allegations of that petition.

¶10. On May 16, 2001, Mrs. Bardwell, Michael Faust, and Martha Ann Powell, through counsel, filed a petition, in which the Guardian Ad Litem also joined, requesting the court to appoint Faust as the conservator of the estate of Mrs. Bardwell and Powell as the conservator of the person of Mrs. Bardwell.

6

This petition also revealed that at a hearing on May 14, 2001, Randy, with counsel, chose to withdraw as the conservator of the person and estate of Mrs. Bardwell. By decree signed the same day, the chancellor granted the relief requested in the petition.

¶11.    On June 14, 2001, Randy filed a typed log reflecting the date and time and service performed for the estate. Randy also filed a First Annual Accounting, detailing Mrs. Bardwell's Net Income, Expense, and Asset Values. This accounting reflected the value of Mrs. Bardwell's estate to be $ 1,712,433.78.

¶12.    On July 23, 2001 the chancellor ordered Randy to return any money expended by him which was not specifically authorized by the court and to file documentation supporting his claim for conservator fees in the amount of $27,000. The court set a hearing for September 4, 2001.

¶13.    On August 3, 2001, the Guardian ad Litem filed a response to the First Annual Accounting, alleging that Randy had not adequately documented fees he had paid himself. On August 15, 2001, the chancellor entered an order wherein he noted receiving the documentation regarding justification of the conservator fees and set a hearing for October 30, 2001. The chancellor hand-wrote on the order: "Randy Bardwell shall immediately comply with this Court's prior order requiring re-payment of all fees not specifically authorized."

¶14.    By letter opinion and separate order, each dated November 2, 2001, and duly filed on November 9, 2001, the chancellor issued a detailed ruling as to Randy's tenure as conservator of Mrs. Bardwell. The fourteen-page opinion contained a procedural history and findings of fact and conclusions of law. The chancellor found that Randy was entitled to a "reasonable and appropriate fee" of $4,385.55, as opposed to the $27,000.00 previously paid to him.[4] The chancellor also found that Randy paid himself an additional $19,750.00 subsequent to entry of the order authorizing payment of the $27,000.00 conservator's fee;

[4]The actual amount was $27,062.50.

7

therefore, the chancellor ordered that the additional conservator fee was without authority and must be repaid. A total of $42,426.95 was ordered to be repaid by Randy at 8 percent interest.

¶15. It is from the chancellor's opinion and order of November 2, 2001, that Randy now appeals. Although the procedural history thus far given is not complete, we have set out as much as is necessary for the discussion of the issues before us.

**STANDARD OF REVIEW**

¶16. Upon a review of a chancellor's findings of fact, we will not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous. *Bowers Window & Door Co. v. Dearman,* 549 So.2d 1309, 1312-13 (Miss. 1989). Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed. *Denson v. George*, 642 So.2d 909, 913 (Miss. 1994) (citing *Johnson v. Hinds County,* 524 So.2d 947, 956 (Miss. 1988); *Culbreath v. Johnson,* 427 So.2d 705, 707-08 (Miss. 1983)).

**DISCUSSION**

**I.  WHETHER THE CHANCELLOR ERRED IN REFUSING TO RECUSE HIMSELF.**

¶17. Randy asserts that the chancellor erred in failing to recuse himself after making the comment that "I made some mistakes by authorizing a fee that I did not have sufficient information on, and I did not look at close enough... And in retrospect obviously I wish I hadn't done that." Randy alleges that the chancellor had become sufficiently involved in the case to warrant recusal because the chancellor confirmed the appointment of conservator, authorized him to enter into a timber management contract, authorized the

payment of expenses of the conservatorship, and authorized the $27,000 conservator's fee. This Court

disagrees with Randy's logic.

¶18. The Code of Judicial Conduct, Canon 3C(1)[5] states, in pertinent part:

> C. Disqualification.
>
> > (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
> >
> > > (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

¶19. A meticulous review of the record reveals absolutely nothing that would even remotely suggest that

the chancellor should have recused himself in this case. We have held that the chancellor is the "ultimate

guardian" of wards. *Jackson v. Jackson*, 732 So.2d 916, 920 (Miss. 1999). The chancellor

understood his role and concluded the discussion of the history of the case with the following remarks:

> if Mr. Bardwell can justify those fees, then the court doesn't have any problem approving them. I don't think from what he has filed that that substantiates the $27,000 fee, and I think that it's my responsibility to bring that into question and I 've done that. So I don't think it's appropriate or necessary that the court be recused. In furtherance of that concern though and being careful and I think doing what's appropriate under the law, I consulted with another chancellor who's been serving probably four or five times longer than I have or in excess of 30 years and sought his learned, wise, and longstanding experience and got the benefit

---

[5]Reference is made to the Code of Judicial Conduct as it existed at all pertinent times relating to the trial court proceedings. A new Code of Judicial Conduct was adopted by this Court on April 4, 2002. Among other things, the new Code of Judicial Conduct contains gender-neutral language. Other than the gender-neutral changes, the language of the above quoted section remains basically unaltered in the current Code, and may now be found in Canon 3E(1)(a).

of his opinion that he thought that I was appropriate in going forward and hearing the matter.[6]

¶20. In *Bryan v. Holzer*, 589 So.2d 648 (Miss. 1991), we held that the chancellor did not abuse his discretion in refusing to recuse himself from a case in which he had limited ex parte contacts with a lawyer representing a party in that pending case. In *Bryan*, we explained the criteria judges should consider in recusal:

> Whereas here, the conduct of a judge or chancellor is being examined under the dictates of a canon of the Code of Judicial Conduct, "the Canon enjoys the status of law such that we enforce it rigorously, notwithstanding the lack of a litigant's specific demand." *Collins v. Dixie Transport, Inc.*, 543 So.2d 160, 164 (Miss. 1989); *Jenkins v. Forrest County General Hospital*, 542 So.2d 1180, 1181 (Miss. 1989); *Jenkins v. State*, 570 So.2d 1191, 1192 (Miss. 1990). The standard by which this Court determines if a judge should have disqualified him or herself, is an objective standard under Canon 3. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss. 1986); *Jenkins*, 570 So.2d at 1192; *Collins*, 543 So.2d at 166. The presumption is "that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a 'reasonable doubt' (about the validity of the presumption) [.]" *Turner v. State*, 573 So.2d 657, 678 (Miss. 1990). When a judge is not disqualified under the constitutional or statutory provisions, "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." *Ruffin v. State*, 481 So.2d 312 at 317 (Miss. 1985) (quoting *McLendon v. State*, 187 Miss. 247, 191 So. 821, 823 (1939)); *Buchanan v. Buchanan*, 587 So.2d 892 (Miss. 1991); *Turner*, 573 So.2d at 677.

---

[6]So that there can no misunderstanding, the chancellor likewise acted appropriately in consulting another chancellor. While Canon 3 A(4) of the former Code of Judicial Conduct prohibited a judge's ex parte communication concerning a pending or impending proceeding, the Commentary stated that this prohibition did not preclude a judge "from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out his adjudicative duties." Corresponding language in the current Code of Judicial Conduct may be found in Canon 3B(7)(c).

*Bryan*, 589 So.2d at 654.

¶21.    In *Collins*, we reversed a circuit court's order enforcing an oral settlement agreement reached on the day of trial when the circuit judge was purportedly a fact witness concerning the disputed facts going to the very heart of the issue of whether to enforce the settlement agreement.   We directed that upon remand, the circuit judge should recuse himself from further participation in the case.  *Collins v. Dixie Transp., Inc.*, 543 So.2d 160, 167 (Miss. 1989).  We have also found that recusal was warranted where the chancellor had a pecuniary interest in the outcome of the case.  *Stephens v. Mayor & Bd. of Aldermen of City of Natchez*, 261 So.2d 486 (Miss. 1972).

¶22.    Turning to the relevant facts of the case before us today, we are firmly convinced that there was absolutely no real or perceived reason for the chancellor to recuse himself.  Randy argues that the chancellor's recusal was warranted when the chancellor had become sufficiently involved by his presiding over the case, confirming Randy's appointment as conservator, authorizing him to enter into a timber management contract, authorizing him to pay expenses of the conservatorship, and authorizing the $27,000 conservator's fee; however, this argument is without merit.  Randy seems to think that the chancellor had perhaps prejudged his case when he admitted making mistakes in authorizing a fee without sufficient information and in turn stated that "I wish I hadn't done that."  However the chancellor further found that if Randy could subsequently justify the fees, he "[didn't] have any problem approving them."

¶23.    If we were to declare today on the facts of this case that the chancellor had "sufficient involvement" which warranted recusal, we would be establishing a standard whereby all chancellors would have to recuse themselves from all matters tried in their courts wherein they had previously heard anything involving the case.  To carry this scenario out further, if "substantial involvement" in a case (or a party) were legitimate grounds for recusal, a circuit judge or county judge with five indictments on the same defendant

11

would have to get four other judges involved in presiding over the remaining cases because of "substantial involvement" with the criminal defendant in the first case. Obviously, this is but one example of numerous absurdities which would result from such a declaration.

¶24. After all, when we get right down to it, all the chancellor was doing once he realized a mistake was made was reacting in a manner inherently ingrained into our chancellors to do equity and to protect the ward and her estate. Over seventy years ago, this Court informed our chancellors that they were "superior guardians" over persons under a disability, and that our chancery courts "must take all necessary steps to conserve and protect the best interest" of the wards of the court. *Union Chevrolet Co. v. Arrington*, 162 Miss. 816, 138 So. 593, 595 (1932).

¶25. Keeping in mind the *Union Chevrolet* and *Jackson* mandates and the above discussion regarding recusal, we find no basis for the chancellor's recusal in the case sub judice. A close review of the entire record in this case reveals that the learned chancellor was astutely aware of his constitutional oath, his duty to the ward, and his ethical responsibilities under the Code of Judicial Conduct.

¶26. Therefore, this issue is without merit.

## II. WHETHER THE CHANCELLOR ERRED IN FINDING RANDY'S FEES WERE INAPPROPRIATE AND UNREASONABLE.

¶27. In addressing this assignment of error, we turn to our statutes and rules. Miss. Code Ann. § 93-13-35 (Rev. 1994) states:

> The chancery court or chancellor in vacation, may, at discretion, settle the sum to be expended in the maintenance and education of a ward, having regard to his or her station, future prospects and destination; and may allow expenditures in excess of the income of the estate, and, if necessary, may order sale of so much of the personal estate as may be necessary to meet such expenditures. And if the personal estate and the rents and profits of the real estate be not sufficient for the maintenance and education of the ward, the court may, on investigation, decree the sale of

12

such part of the real estate of the ward as may be necessary for the purpose; but if it be more advantageous to the ward, the court may order the sale of real estate in preference to the sale of personal property. *No guardian shall make any expenditure in excess of his ward's income for the ward's support and education without a previous order of the court or chancellor authorizing the same*.

(emphasis added). Miss. Code Ann. § 93-13-38(2) (Supp. 2002), as amended in 1996, states, in

pertinent part:

It shall be the duty of the guardian of wards defined by Section 1-3-58, Mississippi Code of 1972, to improve the estate committed to his charge, and to apply so much of the income, profit or body thereof as may be necessary for the comfortable maintenance and support of the ward and of his family, if he have any, *after obtaining an order of the court fixing the amount*....

(emphasis added). Miss. Code Ann. § 93-13-259 (Rev. 1994) states:

Should the court appoint the conservator of the property or person or property and person of the subject party, the said conservator shall have the same duties, powers and responsibilities as a guardian of a minor, and all laws relative to the guardianship of a minor shall be applicable to a conservator.

We find further guidance in the Uniform Chancery Court Rules (UCCR). UCCR 6.11 states:

Every petition by a fiduciary for the allowance of commissions, or for compensation for extra services and expenses, shall show the total amount of the estate coming into his hands, the total amount disbursed, the balance on hand, the nature and extent of the service rendered and expense incurred by him, and the total amount previous allowed to him on account thereof. *Fees for fiduciaries and attorneys shall not be based on the value of any real property*.

(emphasis added).

¶28. A review of the record reveals that the chancellor did not in any way abuse his discretion in finding

that Randy's conservator's fee was both inappropriate and unreasonable. Randy first filed his petition for

appointment as conservator on May 5, 2000, and he was appointed conservator of Mrs. Bardwell's

person and estate on May 11, 2000. His first act as conservator was to file a petition to enter into a timber management contract, knowing that Mrs. Bardwell was opposed to the cutting and selling of her timber. On August 28, 2000, he filed a petition to disburse gifts of $10,000 each to himself, his three children, and Lester Lambert. He then filed a ten-year Forest Management Plan on September 1, 2000, with the stated purpose being "to protect and enhance each acre in producing the most in wildlife habitat and income for landowners to enjoyment (sic)." On September 1, 2000, the chancellor by decree authorized Randy to enter into the timber management contract, which decree contained the following provision:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the Conservator/Successor Trustee be and he is authorized to pay such expenses and fees that have accrued to the conservatorship and to continue to make such payments as are deemed proper and to account therefore annually, *including the conservator's fee to one of $27,000.00*.

(emphasis added). The italicized portion of the decree was handwritten.

¶29. On September 8, 2000, Randy filed a nine-page handwritten log of the time he spent working on the estate. The log detailed the date, time, and the tasks performed. He billed each hour at $125, which came out, according to his log, to $27,062.50. The next document that follows in the record is the Petition to Set Aside Conservator, Appoint New Conservator, Provide and Accounting, and Issuance of a TRO or a Restraining Order, filed by Mrs. Bardwell and Lester G. Lambert, Jr. An Agreed Temporary Restraining Order was filed on October 19, 2000, wherein it was ordered that Randy agreed to immediately cease and desist from cutting timber from Mrs. Bardwell's land. An inventory, filed on November 14, 2000, revealed the assets of the ward to consist of a life estate interest in Mrs. Bardwell's home and property consisting of 120 acres in Amite County, personal property in and about the home, a

$345,446.77 balance in an AmSouth Premium Money Market account, and a $15,012.92 balance in an AmSouth checking account.

¶30. We find based on the record that the chancellor was in error in initially authorizing the $27,000 conservator's fee as such award was clearly unreasonable. Additionally, there is nothing in the record which convinces us Randy's actions comported with the provisions of Miss. Code Ann. §§ 93-13-35 or 93-13-38. Nor was the petition accompanied by proof of the assets in the conservatorship and the inventory was not filed until two months later. This filing of inventory was beyond the 60-day deadline ordered by the chancellor and beyond the three-month deadline mandate by Miss. Code Ann. § 93-13-33.[7]

¶31. Although Randy now argues that the estate was valued at $1,712,433.78, the first evidence in the record of this figure is the First Annual Accounting filed on June 14, 2001. According to Randy's accounting, the estate consisted of real property assessed at a value of $1,000 per acre ($717,200), the estimated value of timber from the land ($677,000), and $318,233.78 in bank checking and money market accounts and certificates of deposit. Accepting the uncut timber as real property, the total value of the real property in the estate, according to Randy, was $1,394,200. UCCR 6.11 forbids payment of conservator's fees based on the value of real property. Rule 6.11 expressly provides in pertinent part that

---

[7]Miss. Code Ann. § 93-13-33 (Rev. 1994) states:

> Every guardian shall, within three months after his appointment, return to the court, under oath, a true and perfect inventory of the estate, real and personal, and of all money or other things which he may have received as the property of his ward; and he shall return additional inventories of whatever he may subsequently receive. And he shall annually return an inventory, under oath, of the increase of the estate, if there be any. A guardian who shall fail to return inventories may be removed and his bond put in suit, unless he can show cause for the default.

"[f]ees for fiduciaries and attorneys shall not be based on the value of any real property." Randy likewise violated the provisions of UCCR 6.11 in not properly documenting via an appropriately filed petition his justification for receiving a $27,000 conservator's fee.

¶32. Nor was the matter ever properly submitted to the chancellor. The record does not reflect that the chancellor had the statutorily-mandated filings before him to make a determination as to the conservator's fee. The only mention of the assets of the estate before the entry of the order authorizing the conservator's fee is Randy's petition to distribute $50,000 from Mrs. Bardwell's estate to himself, his three children, and Leslie. That petition reflects the estate to be valved at $1,851,426.

¶33. Further, Miss. Code Ann. § 93-13-35 requires that "[n]o guardian shall make any expenditure in excess of his ward's income for the ward's support and education without a previous order of the court or chancellor authorizing the same." There was no proper documentation before the court detailing the income of the ward, and, as such, the authorization of the conservator's fee was in error.

¶34. For these reasons, we find that the chancellor erred in awarding conservator's fees in the amount of $27,000; however, because the chancellor subsequently entered an order which remedied the earlier mistake, we affirm that order of the chancellor awarding a conservator's fee in the amount of $4,385.55 and requiring repayment to the estate for the difference.

### III. WHETHER THE CHANCELLOR ERRED IN FINDING RANDY HAD RECEIVED UNAUTHORIZED FUNDS.

¶35. The third assignment of error is whether the chancellor erred in his finding that additional fees were paid without court authority. Randy relies on the chancellor's order of September 1, 2001, granting additional payments as "expenses" envisioned by the order:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the Conservator/Successor Trustee be and he is authorized to pay such

16

> expenses and fees that have accrued to the conservatorship and to continue to make such payments as are deemed proper and to account therefore annually, *including the conservator's fee to one of $27,000.00*.

However, after the entry of that order, Randy paid himself an additional $19,750 over a two-month period. Using the same reasoning as above, these additional payments are in violation of Miss. Code Ann. §§ 93-13-35 and 93-13-38, as well as UCCR 6.11. The record reveals no request to the Court for payment of these funds. In an analogous situation this Court held that a chancellor did not abuse her discretion by removing a conservator who, inter alia, did not seek court approval before making certain expenditures. *In re Mathews*, 633 So.2d 1038 (Miss. 1994). We held that the conservator's failure to seek court approval before making expenditures was "[m]uch more serious" than his failure to make an annual accounting. Miss. Code Ann. § 93-13-38 "requires that a court order fixing the amount to be spent for the care and maintenance of the ward be obtained *prior* to making such expenditures." *Id.* at 1039.

¶36. Not only was the chancellor totally free of error in finding that Randy had received unauthorized funds which mandated his repayment to the estate, the learned chancellor was eminently correct.

### CONCLUSION

¶37. The chancellor clearly did not abuse his discretion in refusing to recuse himself from this case. Once the chancellor realized that an error had been committed in authorizing Randy to receive a $27,000 conservator's fee from Mrs. Bardwell's estate, he proceeded to fairly and impartially revisit the issue to determine the appropriate action to take while at all times appropriately preserving estate assets until final resolution of this issue. To this end, the chancellor proceeded to meticulously consider the issues before him. In due course, the chancellor entered his fourteen-page opinion and order consistent therewith which found that Randy was entitled to a "reasonable and appropriate fee" of $4,385.55, as opposed to the

17

$27,000, and that additional fees of $19,750 Randy paid himself were without authority and must be repaid. Thus the chancellor appropriately ordered Randy to reimburse Mrs. Bardwell's estate the sum of $42,426.95.[8]

¶38. The activity in this conservatorship as revealed by the record certainly is not indicative of how a conservator should handle the affairs of a ward. In fact the original conservator's actions in this case are indicative of what a conservator should not do in properly representing a ward. Conservators and guardians who might be of an inclination similar to that of the original conservator in this case should not expect mercy from our chancellors or the appellate courts.

¶39. Finding no reversible error, we affirm the order of the Chancery Court of Amite County, Mississippi.

¶40. **AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ AND GRAVES, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

---

[8] Again, we keep in mind that in order to arrive at this sum, we must accurately reflect that the $27,000 figure referred to throughout this opinion is actually $27,062.50. Thus $27,062.50 plus $19,750.00 minus $4,385.55 equals the sum of $42,426.95.